Lisa M. NELSON, Plaintiff–Appellant,

v.

METRO–NORTH COMMUTER RAILROAD, Defendant–Appellee.

No. 99–7762.

United States Court of Appeals, Second Circuit.

Argued Jan. 12, 2000.

Decided Dec. 14, 2000.

Ira M. Maurer, Elkind, Flynn & Maurer, White Plains, NY, for Plaintiff–Appellant.

Carol Sue Barnett, Metro–North Commuter Railroad, New York, N.Y. (Richard K. Bernard, General Counsel, Metro–North Commuter Railroad, on the brief), for Defendant–Appellee.

Before JACOBS, CALABRESI, and KATZMANN, Circuit Judges.

CALABRESI, Circuit Judge:

Plaintiff-appellant Lisa Nelson appeals from a final judgment of the United States District Court for the Southern District of New York (Colleen McMahon, *Judge* ), granting defendant-appellee Metro–North Commuter Railroad's motion for judgment as a matter of law on Nelson's claim for negligent infliction of emotional distress under the Federal Employers' Liability Act (the "FELA"), 45 U.S.C. §§ 51–60, and dismissing Nelson's complaint. We affirm.

I

In 1995, when the events leading to this action began, Lisa Nelson was a ticket agent employed at Metro–North's Poughkeepsie, New York, train station. Among other duties, she announced train arrivals and departures, sold tickets, and gave change to conductors. For the most part, she worked inside the ticket office, a separate room within the train station with a door that could be locked and a window through which tickets were sold.

Starting in late 1995, Nelson was the object of unwanted sexual comments and touching by Kregg Houle, a conductor for Metro–North who reported to work at the Poughkeepsie station. Nelson testified that there were four incidents of harassment. First, in late November, Nelson lent Houle $100 from her "bank" to use as change during his trip. When he returned the money, he told her, "You're worth it," then patted her on the buttocks. Second, around Christmas, when Nelson was wearing a shirt with a picture of Frosty the Snowman on it, Houle came up behind her, put his hands under her shirt, and grabbed her breasts, telling her, "I'm going to do you behind that machine. I never done it to a woman in a Frosty shirt." Third, Houle made comments in front of Nelson and her husband to the effect that "Her old man doesn't give it to her good enough, so I'm going to give it to her. You know, she's crabby in the morning because her old man doesn't give it to her." Fourth, and finally, Houle came into the ticket office and made the same kind of comments, and then slapped Nelson on the buttocks three times before leaving. The last two incidents were witnessed by Bob Magill, a custodian for Metro–North.

After the final incident, Magill urged Nelson to report Houle, and she did, calling Maureen Wilhelmy, her immediate supervisor. Wilhelmy in turn reported the harassment to Maryann Gormley–O'Connor, in Metro–North's Affirmative Action Department. Gormley–O'Connor telephoned Nelson and listened to her account of the harassment; she also spoke to Magill, who confirmed Nelson's account of the comments made by Houle and her description of the final incident. She then interviewed Houle, who said that he and Nelson were friends and that he might have put his arm around Nelson, but denied that he had sexually harassed her. Gormley–O'Connor gave Houle a copy of Metro–North's sexual harassment prevention policy and told him that he was not to enter the ticket office, but should conduct his business at the window. Gormley–O'Connor then telephoned Nelson and informed her that she had spoken with Houle and that he had denied any harassment.

Upset that Gormley–O'Connor had spoken with Houle, and feeling that her complaint was not being taken seriously, Nelson contacted the Metro–North Police and

lodged a complaint against Houle. The police took the statements of Nelson and Magill, and on December 21, 1995, they arrested Houle and charged him with third-degree sexual abuse, a misdemeanor. The police also obtained an order of protection for Nelson requiring Houle to stay 100 feet away from her place of business or employment and 2500 feet away from her home.[1] The same day, Metro–North suspended Houle from work, and on December 28, Metro–North notified Houle by letter that he was charged with "[c]onduct unbecoming a Metro–North employee," and directed that he attend a hearing to determine his responsibility in the matter. Before the date of the hearing, however, the Dutchess County District Attorney wrote to Metro North requesting that any administrative hearings be postponed until the criminal case was resolved. Metro–North suspended its investigation and allowed Houle to return to work on or about January 3, 1996.[2]

Beginning sometime in late January, Nelson encountered Houle several times while she was at work. On the first occasion, according to her testimony, she had left the ticket office to go to the ladies' room and "just about collided" with Houle as he was walking away from the snack bar (which was near the ladies' room) toward the tracks (which were on a lower level, below the main level where Nelson worked). Houle said to her something like, "It's not working, is it?" and smiled and walked away. Subsequently, Nelson saw Houle on several occasions in the upper level, and "there was always that smirk, almost like he knew he was getting away with something because he was on the upper level." Houle never approached the ticket window or entered the ticket office while Nelson was present; nor did he touch Nelson again or make any more sexual comments.

Nelson contacted the Metro–North Police to tell them that she had seen Houle in the upper level of the station. The police instructed Houle to stay away from Nelson and not to attempt to contact her, but did not arrest him, because they believed that Houle had not intended to violate the order of protection. Nelson also asked Gormley O'Connor if she could instruct Houle not to come to the upper level, and to enter and depart the station through a lower-level entrance; Gormley O'Connor refused, saying that under the collective bargaining agreement she could not transfer Houle, and that Houle had as much right to be in the station as Nelson did.

On June 16, 1998, Nelson brought this suit against Metro North, alleging negligent infliction of emotional distress in violation of the FELA. Nelson contended that, by allowing Houle into the upper level of the train station, where she worked, even after she had reported the harassment, Metro–North had negligently placed her in danger of further harassment and caused her considerable emotional distress. She sought $1 million in damages. The district court denied Metro–North's motion for summary judgment, and the case proceeded to trial.

At trial, Nelson's psychiatrist, Larry Ertrachter, testified that she had experienced post-traumatic stress disorder as a result of the harassment by Houle, and that continuing to see him at work "had a very dramatic impact on her ... in terms of exacerbating her symptoms." According to Ertrachter, Nelson felt that she was in danger from Houle, and seeing Houle sometimes caused nightmares and flashbacks to the original harassment.

1.  On February 1, Nelson's original order of protection expired, and she obtained a new order of protection effective through May 1 that directed Houle to stay away from Nelson's place of employment, but did not contain the "100 feet" provision.

2.  The record is not clear as to the exact date of Houle's return to work.

At the close of plaintiff's case, Metro–North moved for judgment as a matter of law. The district court granted the motion, holding that Nelson had failed to present evidence sufficient to meet the test established by the Supreme Court in *Consolidated Rail Corp. v. Gottshall*, 512 U.S. 532, 114 S.Ct. 2396, 129 L.Ed.2d 427 (1994), for a negligent infliction of emotional distress action under the FELA. Under the *Gottshall* test, an FELA plaintiff can recover for emotional injury only if she either "sustain[ed] a physical impact" or was "placed in immediate risk of physical harm" as a result of her employer's negligence. *Id.* at 547–48, 114 S.Ct. 2396. The district court found that Nelson had not sustained any physical impact caused by Metro–North's negligence. Nor, the court concluded, was Nelson placed in immediate risk of physical harm by Metro–North's failure to keep Houle away from her, because after Nelson complained to Metro–North and to the police, "the unrebutted evidence demonstrates, that there were no further threats, there were no further physical encounters, there was no further touching, there were no further approaches to the ticket office." Accordingly, the district court entered judgment as a matter of law for Metro–North.

## II

On appeal, Nelson contests the district court's grant of judgment, contending that she satisfied the *Gottshall* test.

■ We review a district court's decision to grant judgment as a matter of law *de novo*. *See, e.g., Coffey v. Dobbs Int'l Servs., Inc.*, 170 F.3d 323, 326 (2d Cir. 1999). And in doing so, we view the evidence "in the light most favorable to the nonmoving party," *Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 494 (2d Cir.1995) (quoting *Samuels v. Air Transp. Local 504*, 992 F.2d 12, 14 (2d Cir.1993)) (internal quotation marks omitted), "without weighing the credibility of the witnesses or otherwise considering the weight of the evidence," *id.* (quoting *Samuels*, 992 F.2d at 14 (quoting *Simblest v. Maynard*, 427 F.2d 1, 4 (2d. Cir.1970))) (internal quotation marks omitted).

### A

■ The FELA provides that "[e]very common carrier by railroad ... shall be liable in damages to any person suffering injury while he is employed by such carrier ... for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier." 45 U.S.C. § 51. In *Gottshall*, a case in which a railroad worker experienced severe psychiatric problems after witnessing the death of a fellow worker while on the job and being required to continue working within sight of the coworker's body, the Supreme Court held that claims for negligent infliction of emotional distress are cognizable under the FELA. *See Gottshall*, 512 U.S. at 550, 114 S.Ct. 2396. But to curtail what it believed might otherwise be "unpredictable and nearly infinite liability for defendants," *id.* at 552, 114 S.Ct. 2396, the Court adopted the "zone of danger" test developed as common law in many jurisdictions, and rejected the broader test that had been used by the Third Circuit. *See id.* at 554, 114 S.Ct. 2396. As formulated by the Court, "the zone of danger test limits recovery for emotional injury to those plaintiffs [1] who sustain a physical impact as a result of a defendant's negligent conduct, or [2] who are placed in immediate risk of physical harm by that conduct." *Id.* at 547–48, 114 S.Ct. 2396.[3]

3. At the same time, *Gottshall* overturned the Third Circuit's decision in another case, *Carlisle v. Consolidated Rail Corp.*, 990 F.2d 90 (3d Cir.1993). In that case, the plaintiff had suffered a nervous breakdown after being required to work under extremely stressful conditions. The Third Circuit affirmed a jury verdict for the plaintiff on his negligent infliction of emotional distress claim. The Supreme Court reversed, finding that "Carlisle's work-stress-related claim plainly does not fall within the common law's conception of the

The Court did not itself apply the zone of danger test to the facts before it, but remanded to the Third Circuit to consider in the first instance whether Gottshall's injuries were recoverable under that test.[4]

More recently, the Court applied the "physical impact" prong of the zone of danger test to a case in which the plaintiff was negligently exposed to large quantities of asbestos while working as a pipe-fitter for Metro–North. *See Metro–North Commuter R.R. Co. v. Buckley*, 521 U.S. 424, 427–30, 117 S.Ct. 2113, 138 L.Ed.2d 560 (1997). Although, as of the date of his lawsuit, Buckley had shown no signs of asbestos-related disease, he alleged emotional damages due to his fear of developing such disease in the future. *See id.* at 427, 117 S.Ct. 2113. The Supreme Court held that Buckley's exposure to asbestos did not constitute a "physical impact" within the meaning of *Gottshall*. *See id.* at 430–33, 117 S.Ct. 2113.

■ *Gottshall* and *Buckley* have significantly elucidated the contours of employers' liability for negligent infliction of emotional distress under the FELA. In particular, *Gottshall* took an important step both by recognizing that such emotional distress claims are actionable under the FELA, and by establishing that physical impact is not a prerequisite to bringing such a claim. But to state a test is not to apply it—as the *Gottshall* Court recognized. *See Gottshall*, 512 U.S. at 558, 114 S.Ct. 2396. Accordingly, the lower federal courts have been left the task of interpreting the test formulated in *Gottshall* and *Buckley* and refining it through application

to different factual situations. *See id.; id.* at 558–59, 114 S.Ct. 2396 (Souter, *J.*, concurring) (noting that courts must "develop a federal common law of negligence under FELA, informed by reference to the evolving common law").

**B**

■ In the natural sequence of inquiries, we should consider whether Nelson presented enough evidence of negligence on defendant's part to survive summary judgment before we proceed to the question of whether, under *Gottshall*, defendant's conduct permitted Nelson to recover for her purely emotional damages. Although the showing of negligence here is not much, and arguably may be insufficient, the quantum of evidence that suffices in FELA cases is significantly lower than in ordinary torts cases. *See Williams v. Long Island R.R. Co.*, 196 F.3d 402, 406 (2d Cir.1999) ("[A] relaxed standard of negligence applies in FELA cases in this Circuit."); *Syverson v. Consolidated Rail Corp.*, 19 F.3d 824, 826 (2d Cir.1994) ("Under FELA, however, the ordinary standards for negligence are relaxed so that an employer subject to this statute is potentially responsible for risks that would be too remote to support liability under common law."). In addition, we note that the proposed Restatement (Third) of Torts takes the (generally accepted) position that "[t]he harm whose severity should be considered ... is not the particular harm incurred by the plaintiff, but whatever harms are rendered more likely by the actor's conduct."[5] Restatement (Third) of Torts:

---

zone of danger." *Gottshall*, 512 U.S. at 558, 114 S.Ct. 2396. It declined to "take the radical step of reading FELA as compensating for stress arising in the ordinary course of employment." *Id.*

4. On remand, the Third Circuit found that Gottshall's claim did not satisfy the zone of danger test, because (1) he was not subjected to any physical impact, and (2) his working conditions were not "extreme and dangerous enough as to place [him] in immediate risk of

physical harm." *Gottshall v. Consolidated Rail Corp.*, 56 F.3d 530, 535 (3d Cir.1995).

5. It is not unlikely that because negligence is defined so as to allow liability for even relatively unlikely physical harms—if enough other harms are possible—that the *Gottshall* test was developed, in an FELA case after all, to bar recovery for purely emotional damages *unless* the risk of the *physical* harms was *on its own* "immediate."

Gen. Principles § 4, Comment g (Discussion Draft 1999). We will therefore proceed on the assumption, also made by the district court, that there is enough evidence of negligence to go to a jury.

## C

This does not mean, however, that Nelson has adduced enough evidence to create a jury question as to whether, under *Gottshall*, she was placed in "immediate risk of physical harm" by defendant's conduct. In order adequately to review the district court's decision that she did not, we must delve into the meaning of the *Gottshall* test—a task that necessitates an understanding of the development at common law of the tort of negligent infliction of emotional distress, and the concerns that underlay the *Gottshall* Court's decision to adopt its particular approach to that tort.

The traditional common-law standard for dealing with negligent infliction of emotional distress claims, and the rule still followed in some jurisdictions, required that a plaintiff have sustained a physical impact due to the defendant's negligence before she could recover emotional damages. *See, e.g., OB–GYN Assocs. v. Littleton*, 259 Ga. 663, 386 S.E.2d 146, 148–49 (1989), *overruled by Lee v. State Farm Mut. Ins. Co.*, 272 Ga. 583, 533 S.E.2d 82 (2000); *Hammond v. Central Lane Communications Ctr.*, 312 Or. 17, 816 P.2d 593, 596–97 (1991). The rule was intended to curtail what courts feared might otherwise be a flood of trivial or fraudulent claims, or claims for emotional injury causally remote from the defendant's conduct. *See, e.g., Shuamber v. Henderson*, 579 N.E.2d 452, 455 (Ind.1991).

As originally formulated, the physical impact rule required a physical *injury*. *See, e.g., Littleton*, 386 S.E.2d at 149 (holding that the impact necessary for a negligent infliction of emotional distress action must be a physical injury); *Hammond*, 816 P.2d at 597 (same). Mere physical *contact* was neither necessary nor sufficient to satisfy the impact rule.

Rather, under that rule, emotional damages could be recovered only if they were caused by some physical hurt that was itself caused by the defendant's negligence. And, absent such an injury, emotional distress was not compensable even if it ultimately manifested itself in physical harm to the plaintiff. Moreover, in the latter circumstances, even the physical harm that derived from the emotional injury was not compensable. *See, e.g., Spade v. Lynn & Boston R.R. Co.*, 168 Mass. 285, 47 N.E. 88, 89 (1897) ("[T]here can be no recovery for fright, terror, alarm, anxiety, or distress of mind, if these are unaccompanied by some physical injury; and, if this rule is to stand, we think it should also be held that there can be no recovery for such physical injuries as may be caused solely by such mental disturbance, where there is no injury to the person from without."), *overruled by Dziokonski v. Babineau*, 375 Mass. 555, 380 N.E.2d 1295 (1978).

Thus, in *Spade*, the leading case for the traditional impact doctrine, a woman who was brushed against by a drunk who was being ejected from a train, and as a result suffered emotional damages that led to physical injury, was barred from recovery because the contact with the drunk man did not itself physically injure her. *See Spade*, 47 N.E. at 89. Conversely, under the impact rule, plaintiffs could recover emotional damages caused by a physical injury although there was no actual contact caused by the defendant; for example, a plaintiff who injured himself leaping out of the way of a train could recover for that physical injury and for any associated emotional harm. *See, e.g., Bullard v. Central Vermont Ry., Inc.*, 565 F.2d 193, 197 (1st Cir.1977) (holding, in an FELA case, that a railway employee who injured his foot when he jumped out of the way of a train collision could "recover for his fright at the time of the accident"); *see also* 3 Fowler V. Harper, Fleming James, Jr. & Oscar S. Gray, *The Law of Torts* § 18.4, at 686 (2d ed.1986).

Such a brittle rule, turning as it does solely on the existence *vel non* of physical impact, leaves a great deal to be desired. On the one hand, under the traditional rule, the most minimal of physical injuries suffices to allow a plaintiff to recover essentially unlimited damages for emotional distress flowing from that injury,[6] even if the distress is a fear of future illness that is very unlikely to occur. *See, e.g., Marchica v. Long Island R.R. Co.*, 31 F.3d 1197, 1202–03 (2d Cir.1994). In *Marchica*, an FELA case, the plaintiff suffered a puncture wound from a hypodermic needle while cleaning up a pile of trash in the train station where he worked. Although no evidence was introduced that he had been exposed to HIV, and though medical tests eventually showed that he had not been, the plaintiff was allowed to recover damages under the FELA for negligent infliction of emotional distress due to his fear of developing AIDS (including damages for his continuing distress after he knew to a virtual certainty that he would not develop AIDS). *See id.; see also id.* at 1207–08.[7]

On the other hand, the physical impact rule makes no allowance for reasonable fear of physical injury stemming from defendant's negligent conduct in cases in which no impact on the plaintiff occurred. And *Gottshall* wisely ruled that such an approach was dissonant with the remedial goals of the FELA. *See Gottshall,* 512 U.S.

at 556, 114 S.Ct. 2396 (commenting that "[w]e see no reason . . . to allow an employer to escape liability for emotional injury caused by the apprehension of physical impact simply because of the fortuity that the impact did not occur").

Moreover, although the impact rule sought to narrow the scope of liability by reducing the number of fraudulent and speculative claims brought, even courts in jurisdictions following that rule have recognized that the mere existence of a physical injury does little to decrease the chance of fraud or the difficulty of the task faced by a jury in deciding whether emotional distress is present. *See, e.g., Shuamber,* 579 N.E.2d at 455 ("The mere fact of a physical injury, however minor, does not make mental distress damages any less speculative, subject to exaggeration, or likely to lead to fictitious claims. . . . [T]he presence or absence of some physical injury does nothing to alleviate the jury's burden in deciding whether the elements of mental suffering are present." (quoting *Cullison v. Medley,* 570 N.E.2d 27, 30 (Ind.1991)) (internal quotation marks omitted)).

These failings have led courts to turn away from the traditional impact rule. An early exception to the doctrine developed in cases of *intentional* infliction of emotional distress. *See, e.g., Price v. Yellow Pine Paper Mill Co.,* 240 S.W. 588, 594

---

**6.** Numerous examples of such trivial bodily impacts could be given. *See, e.g., Homans v. Boston Elevated Ry. Co.,* 180 Mass. 456, 62 N.E. 737, 737 (1902) (Holmes, *C.J.*) (a slight blow from being thrown against a seat); *Porter v. Delaware, L & W. R.R. Co.,* 73 N.J.L. 405, 63 A. 860, 860 (1906) (dust in the eyes); *Morton v. Stack,* 122 Ohio St. 115, 170 N.E. 869, 869–70 (1930) (per curiam) (smoke inhalation); *see also Christy Bros. Circus v. Turnage,* 38 Ga.App. 581, 144 S.E. 680, 680 (1928) (in case in which a circus horse evacuated its bowels in plaintiff's lap, holding that an "unlawful touching of a person's body, although no actual physical hurt may ensue therefrom, yet, since it violates a personal right, constitutes a physical injury to that person"), *overruled by OB–GYN Assocs.,* 386 S.E.2d at 149.

**7.** Moreover, the brittleness of the impact rule, together with the infelicity of the term "physical impact," has often led to the rule's being misunderstood. Thus, some courts have confused "impact" with "contact" and allowed unlimited emotional damages even in the absence of physical injury, as long as some physical *contact* existed. *See, e.g., Deutsch v. Shein,* 597 S.W.2d 141, 146 (Ky. 1980) (while purporting to apply the impact rule, commenting that "[c]ontact, however slight, trifling, or trivial, will support a cause of action," and concluding that x-rays of the plaintiff's person were sufficient contact to support a claim for emotional damages stemming from fear that the x-rays would injure the plaintiff's fetus).

(Tex.Civ.App.1922) (allowing plaintiff to recover for physical and emotional damages sustained as a result of fright experienced when her husband was brought home bloody and unconscious after an on-the-job accident). And, even in cases of negligent infliction of emotional distress, the common law has, over the course of the last century, moved increasingly toward a less demanding standard for recovery.

Thus, as the *Gottshall* Court noted, many jurisdictions have adopted the "zone of danger" test, under which plaintiffs placed at risk of physical injury by defendant's negligent conduct can recover for resultant emotional distress. *See Gottshall*, 512 U.S. at 547–48 & n. 9, 114 S.Ct. 2396 (citing cases). And a large number of states now apply some variant of a "bystander" test that allows recovery for emotional distress caused by witnessing the injury or death of a third party (who usually must be a close relative) even if the plaintiff was not herself at risk of injury. *See id.* at 548–49 & n. 10, 114 S.Ct. 2396 (citing cases).[8]

Finally, at least two states (Hawaii and Montana) employ a yet broader test under which liability for negligent infliction of emotional distress exists when "a reasonable man, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case." *Rodrigues v. State*, 472 P.2d 509, 520 (1970); *see Sacco v. High Country Indep. Press, Inc.*, 271 Mont. 209, 896 P.2d 411, 424–26 (1995). The *Rodrigues* court stated that the tests adopted by other jurisdictions were intended to "guarantee the genuineness and seriousness of the claim" of emotional distress, and that, accordingly, "the preferable approach is to adopt general standards to test the genu-

ineness and seriousness of mental distress in any particular case," rather than to limit the right to recovery through a requirement that the plaintiff experience a physical impact or be within the zone of danger of a physical impact. *Id.* at 519.

Prior to the Supreme Court's decision in *Gottshall*, federal courts charged with developing the law of negligence under the FELA were faced with the task of choosing among these very different and competing paradigms. In *Gottshall*, the Third Circuit declined to follow a physical impact, zone of danger, or bystander test, and opted instead for an approach similar to Hawaii's. It made the threshold question that of whether the factual circumstances provided sufficient indicia of the genuineness of the emotional injury for which recovery was sought. *See Gottshall v. Consolidated Rail Corp.*, 988 F.2d 355, 371 (3d Cir.1993). If the threshold requirement of genuineness was met, the claim was then to be examined in light of traditional negligence concepts, with the emphasis on the foreseeability of the plaintiff's injury. *See id.* at 374–75. The standard proposed by the Third Circuit thus dispensed both with the requirement of a risk of physical injury that is key to the zone of danger test and with the requirements of physical and relational proximity that form the core of the bystander test.

In rejecting the "genuineness" test proposed by the Third Circuit, and deciding instead to adopt the "zone of danger" test, the Supreme Court reasoned that the tests developed at common law for identifying valid negligent infliction of emotional distress claims were designed not only to filter out fraudulent claims, but also to limit the "unpredictable and nearly infinite

8. The seminal case in this regard was the decision of the California Supreme Court in *Dillon v. Legg*, 68 Cal.2d 728, 69 Cal.Rptr. 72, 441 P.2d 912 (1968), which, in allowing a mother to recover for emotional distress resulting from witnessing her child's death, held that liability should turn not on the risk of physical injury to the plaintiff, but on the foreseeability of emotional harm. *See id.* at

920. The rule of *Dillon* has since been limited in California to situations in which the plaintiff (1) is closely related to the victim (2) is present at the accident and perceives the victim's injury at the time it occurs, and (3) suffers serious emotional distress. *See Thing v. La Chusa*, 48 Cal.3d 644, 257 Cal.Rptr. 865, 771 P.2d 814, 829–30 (1989) (footnotes omitted).

liability" that could result from allowing recovery to all the persons "who might suffer real emotional harm as a result of a single instance of negligent conduct." *Gottshall,* 512 U.S. at 552, 114 S.Ct. 2396. And it concluded that a requirement of actual or threatened physical harm afforded the best means of limiting liability and rendering it relatively predictable. *See id.* at 554, 114 S.Ct. 2396. Moreover, the Court found the zone of danger test to be most "consistent with FELA's central focus on *physical* perils." *Id.* at 555, 114 S.Ct. 2396 (emphasis added). Accordingly, it held that, under the FELA, plaintiffs "who sustain a physical impact as a result of a defendant's negligent conduct, or who are placed in immediate risk of physical harm by that conduct," could recover for emotional distress. *Id.* at 547–48, 114 S.Ct. 2396.[9]

■ The *Gottshall* Court did not explicitly define either "physical impact" or "immediate risk of physical harm." In its subsequent decision in *Buckley,* the Court clarified the meaning of "physical impact" under *Gottshall,* holding that exposure to a carcinogenic substance that caused no harm other than increasing the plaintiff's risk of cancer in the future was not a physical impact. *See Buckley,* 521 U.S. at 432, 117 S.Ct. 2113. "[T]he words 'physical impact,'" the Court reasoned, "do not encompass every form of 'physical contact.' And, in particular, they do not include a contact that amounts to no more than an exposure—an exposure, such as that before us, to a substance that poses some

future risk of disease and which contact causes emotional distress only because the worker learns that he may become ill after a substantial period of time." *Id. Buckley* thus restated the traditional rule that an event cannot constitute a physical impact, even if it entails contact, unless it has a physically harmful effect on the body; in Buckley's case, his exposure to asbestos had not yet caused—and might well never cause—any such physical effect. *See id.* at 427, 117 S.Ct. 2113.

D

Where physical impact does not occur, an FELA plaintiff can still recover emotional damages by showing that she was "placed in immediate risk of physical harm." *Gottshall,* 512 U.S. at 548, 114 S.Ct. 2396. And although *Buckley* held that the plaintiff in that case did not sustain a "physical impact," the Court did not address the meaning of "immediate risk of physical harm," or even its possible applicability to Buckley's case. It simply reversed the Second Circuit's ruling that contact with the carcinogen constituted impact, and remanded for further proceedings consistent with that holding. *See Buckley,* 521 U.S. at 444, 117 S.Ct. 2113. Because the Supreme Court did not apply the "immediate risk of physical harm" prong to the facts of either *Gottshall* or *Buckley,* the meaning of the key term "immediate risk" has remained unclear.

■ In this respect it should be obvious that if defendant's conduct creates *no* risk

9. Later in the opinion, the Court restated the test in slightly different language:

> Under this test, a worker within the zone of danger of physical impact will be able to recover for emotional injury caused by fear of physical injury to himself, whereas a worker outside the zone will not. Railroad employees thus will be able to recover for injuries—physical and emotional—caused by the negligent conduct of their employers that threatens them imminently with physical impact.

*Gottshall,* 512 U.S. at 556, 114 S.Ct. 2396.

Faced with applying the *Gottshall* test, at least one court has suggested that, although

the Court appeared to use the phrases interchangeably, an "imminent[ ]" "threat[ ]" of "physical impact" is not the same as an "immediate risk of physical harm." *See, e.g., Bloom v. Consolidated Rail Corp.,* 41 F.3d 911, 914 (3d Cir.1994). Observing that the two phrases were "seemingly in tension," the *Bloom* court queried "whether the zone of danger test turns ... on risk of physical *impact* or risk of physical *harm.*" *Id.* (emphasis added).

This statement, of course, reflects the old confusion between "impact" and "contact." *See supra* note 7.

of physical harm whatsoever, the *Gottshall* requirement cannot be met. For, if there were *no* risk of physical harm at all, then, of course, there could be no *immediate* risk of physical harm. And there would then be no need to discuss immediacy to see if the *Gottshall* test was passed. In the instant case, however, we cannot affirm the district court on this basis. That is, we cannot say that there was *no* risk of physical harm whatsoever to Nelson. The fact that the risk of physical harm was small, indeed minimal, like the fact that, by itself, that risk of physical harm might well not have sufficed to support a finding of negligence, does not mean that it was *non-existent*. And, once the possibility of physical harm exists, it becomes necessary, under *Gottshall*, to determine whether that risk is "immediate." For only then is recovery permitted.

■ Taken out of context, and assuming it to be the *only* requirement imposed in *Gottshall*, "immediate" might be read to create a purely temporal prerequisite for liability. The existence of a temporally close risk of physical harm, under this view, would then be both necessary and sufficient to sustain a finding of liability for purely emotional damages. This reading would, of course, deny recovery under either prong of the *Gottshall* test to plaintiffs who suffer emotional distress due to the prospect of future physical injury from their employers' negligence, however likely such future injury may be. But, under this reading, the plaintiff before us—and others who face even a minimal, but temporally close physical risk—might very well survive summary judgment. For the risk of physical harm to which Nelson was exposed, though very small, is one that might well have materialized very soon after an encounter with Houle.

■ We do not believe that this is what the Supreme Court meant. We believe that such an interpretation of the *Gottshall* test would be incompatible both with the well-established principle—recognized and relied upon by the *Gottshall* Court—that the FELA is to be construed to further its remedial purpose, *see Gottshall*, 512 U.S. at 543, 114 S.Ct. 2396; *Atchison, Topeka & Santa Fe Ry. Co. v. Buell*, 480 U.S. 557, 561–62 & n. 8, 107 S.Ct. 1410, 94 L.Ed.2d 563 (1987), and with *Gottshall*'s desire to stem unbounded and uncertain recovery. *See Gottshall*, 512 U.S. at 552, 114 S.Ct. 2396 ("A more significant problem is the prospect that allowing such suits can lead to unpredictable and nearly infinite liability for defendants.... This concern ... is based upon the recognized possibility of genuine claims from the essentially infinite number of persons, in an infinite variety of situations, who might suffer real emotional harm as a result of a single instance of negligent conduct.").

Under such a solely temporal reading of *Gottshall*, liability would exist, for example, in cases involving tampering with popular over-the-counter remedies. In such cases, were the "immediacy" requirement deemed to be a purely temporal one, everyone who had taken the particular drugs could recover for fear of poisoning, even though the likelihood of such poisoning was extremely small. For the physical harm, if it occurred, would almost certainly happen quickly. Yet it was just this kind of expansive liability that the *Gottshall* Court sought to avoid. Moreover, placing such a temporal restriction on recovery for purely emotional injury that is tied to a risk of physical harm might also be incongruous in light of the realities of the modern-day workplace, where exposure to toxic substances that create injury or disease in the future is a major cause of work-related illness and death. For all these reasons, a purely temporal test is to be disfavored.

But, if *Gottshall* did not use the term "immediate" in an exclusively temporal sense, then what did it mean? Two other possible readings of the *Gottshall* "immediacy" or "imminence" requirement exist. Each of them, however, has some difficulty.

First, it is possible that immediacy does mean solely *temporal* immediacy, but that temporal immediacy, though a necessary condition, is not a sufficient condition for recovery for emotional harms. Under this reading, in order to recover, a plaintiff would have to show *both* temporal immediacy, *and* that the risk of physical harm was also significant. The difficulty with this reading of *Gottshall*, however, is that the Supreme Court, while not expressly precluding the possibility of additional prerequisites, gave no indication that it meant to add requirements other than immediacy or imminence before permitting recovery. And without such additional requirements, if "immediate" meant only temporally close, then temporal proximity would be both necessary *and* sufficient for recovery of purely emotional damages.

A second possible reading of *Gottshall* is that when the Court used the term "immediate risk of physical harm," it did not mean solely temporal immediacy, but rather, that it was using the term to connote a consideration of some degree of temporal closeness, some degree of spatial proximity, and some degree of likelihood and significance of physical harm. From this perspective, the question of whether a plaintiff is in "immediate risk of physical harm" becomes a complex one involving a number of different factors, of which temporality is one, and likelihood of physical harm another. Under such a test, the lower the risk, the more temporally close the possible physical harm must be, and vice versa. But even physical harms that are temporally highly proximate may fail to justify recovery if the likelihood of their occurring is small enough.

The difficulty with *this* reading is that the words "immediate" and "imminent" seem to sound predominantly in temporality. A broader reading of these terms is not, however, precluded either by the Supreme Court opinion in *Gottshall* or by ordinary usage of the terms themselves. That is, the words "immediate" and "immi-nent" do not, in fact, need to connote only temporal closeness.

Take the common phrase "immediate family." It clearly does not reflect only a temporal relationship, or, indeed, even the absence of intervenors. A half-brother, who is forty years older than I, might very well be part of my "immediate" family, as might, in appropriate circumstances, someone several generations removed, such as a grandparent or great-grandparent. And I could readily consider such a grandparent to be in my "immediate" family, but still not so deem a cousin, notwithstanding the fact that the cousin was born during the period of time separating the birth of my grandfather and myself. In other words, the term "immediate" in a family relationship indicates the weight, the importance, and the closeness of the relationship, as to which temporal matters and intervening causes play a part, and probably an important one, but are not necessarily the only relevant factors.

Were we, moreover, to look at the dictionary definitions of the two words "immediate" and "imminent," used by the Supreme Court in *Gottshall, see Gottshall,* 512 U.S. at 548, 114 S.Ct. 2396; *id.* at 556, 114 S.Ct. 2396, we would find a similar, and considerable, amount of flexibility. "Immediate" is described with little reference to time and much more emphasis on the existence *vel non* of intervening causes. "Imminent," instead, connotes temporality, but is also rendered in terms that focus on the general significance of a danger, *i.e.* "hanging threateningly over one's head." Webster's Third New International Dictionary 1129, 1130 (1993).

Significantly, the Third Circuit, upon hearing *Gottshall* after the Supreme Court acted, seems to have adopted this not solely temporal view of immediacy. For, on remand, it considered factors beyond temporal proximity in performing the immediacy analysis mandated by the Supreme Court. After doing so, the distinguished circuit court denied recovery on the ground, as it said, that the defendant's conduct was not "extreme and dangerous

enough as to place [him] in immediate risk of physical harm." *See Gottshall v. Consolidated Rail Corp.*, 56 F.3d 530, 535 (3d Cir.1995). By focusing on the question of whether plaintiff was work environment was "extreme and dangerous," the Third Circuit therefore, implicitly, but clearly, acknowledged that there is more to *Gottshall's* immediacy than mere temporality.

Despite all this, we would be less than candid if we did not admit that this, more nuanced, reading of the immediacy/imminence requirement, like the reading of *Gottshall* that would add requirements to that of temporal closeness, presents some difficulties. Both read something into *Gottshall's* language. Yet, either is truer to *Gottshall's* manifest intent than a reading of that case that would allow recovery for unlimited and purely emotional damages, even when the risk of physical harm, though temporally close, was minimal.[10] As a result, we are confident that *Gottshall* intended one or the other of the two broader meaning that we have discussed.

■■■■■ And that conclusion is all that is needed to decide the case before us. For both readings require that, even when temporally very close, the risk of physical harm to the plaintiff must be, at the very least, more than minimal. And, in Nelson's case, it was not. It follows, that on either reading of *Gottshall*, this plaintiff loses as a matter of law.[11] Accordingly, we need not, and hence do not take any stand today on which reading is the appropriate one. The matter was not argued before us, or, in such precise terms, before the district court. The answer to whether a truly significant and, perhaps spatially close risk of physical harm, which, if it came about, would not occur until some considerable time after defendant's negligent acts, could, nonetheless, give rise to recovery for purely emotional damages, is not an obvious one.[12] It should not be decided until it actually comes up and is fully briefed and argued.

Because the risk of physical harm to which Nelson was exposed as a result of defendant's conduct was no more than minimal, and because, under either reading of *Gottshall* offered here, such a risk meet the *Gottshall* test, this plaintiff has not made out a case for recovery of purely emotional damages.

\* \* \*

The judgment of the district court is AFFIRMED.

Judge JACOBS concurs in a separate opinion.

10. Importantly, the Supreme Court's more recent discussion of the issue, in *Buckley*, does not preclude either of these readings. All *Buckley* held was that physical impact did not require contact, and it left open the question of whether there could be recovery for risk which was not temporally close, but sufficiently weighty.

11. Nelson contends that she was placed in significant risk of physical harm by Metro–North's failure to keep Houle out of the upper level of the train station after she reported him. But the undisputed facts belie such a claim. Nelson's own testimony showed that Houle never approached the ticket office again after she reported him and Metro–North instructed him to leave her alone, and that the harassment ceased. The encounters between the two after Houle's arrest and the entry of the order of protection, by Nelson's own account, were not the result of Houle's seeking her out, but the result of the fact that they shared a workplace. The presence in the workplace of a person who had previously touched her sexually in all probability did pose some temporally immediate, though minimal, risk to Nelson's safety, since if Houle were to harass her again it would presumably be right after running into her. Yet, given the innocuous nature of Houle's conduct after Nelson reported him, Nelson has not shown that Houle's proximity created a risk to her that was weighty enough to meet the *Gottshall* requirement of immediate risk of physical harm, under either proposed reading.

12. In this respect, we note that, unlike the question of whether there is negligence or not, the inquiry into the weightiness of the physical risk to which a plaintiff is exposed, would, even in FELA cases, be performed by courts and not primarily by juries. *See, e.g., Bloom,* 41 F.3d at 916 (deciding, as a matter of law, that plaintiff "was neither placed in immediate risk of physical harm nor threatened imminently with physical impact.").

JACOBS, Circuit Judge (concurring):

I agree with the result in this appeal and with all the analysis that is needed to support that result. I write separately to emphasize that the Court does not adopt a definition of "immediate," other than to hold that, under any definition considered or conceivable, Nelson does not recover.

I agree with the majority opinion that, regardless of how one defines the term "immediate risk of physical harm," Nelson has not demonstrated immediacy. Maj. Op. at 113. But the majority opinion in dicta then posits and evaluates several definitions, rating some candidates higher than others. In my view, immediacy of risk denotes the absence of mediate intervals of time or place or other circumstance (possibly including cause); i.e., something happened that would have caused plaintiff physical harm then and there if she had been a step closer or a moment sooner or later. My reading of *Gottshall* immediacy is informed by the Supreme Court's use of the immediacy requirement as a limit on litigable claims. See *Gottshall,* 512 U.S. at 552, 114 S.Ct. 2396. *Gottshall* immediacy is conceived in terms of a *zone* of danger. Zonal danger bespeaks risk at a delimited place and time. An extinct volcano is not a danger zone, nor is a point remote from an active one. In this case, nothing happened; Houle did not menace or attack the plaintiff. The discussion of immediacy in the majority opinion is therefore a particularly disembodied form of dicta.[1]

This dicta anticipates issues of some strategic significance. In *Metro–North Commuter Railroad v. Buckley,* 521 U.S. 424, 117 S.Ct. 2113, 138 L.Ed.2d 560

(1997), the Supreme Court reversed an opinion of this Court in which we had held that a railroad worker who inhaled asbestos-containing insulation dust could maintain a FELA action under the "physical impact" prong of the zone of danger test. See *Buckley v. Metro–North Commuter R.R.,* 79 F.3d 1337, 1345–46 (2d Cir.1996). We had reasoned that "physical impact" included contact with a toxic substance that "causes a measurable increase in the *possibility* of [the plaintiff] developing asbestos-related disease" in the future, so long as the contact would "cause fear in a reasonable person." *Id.* at 1344–45 (emphasis added). The Supreme Court reversed, holding that "the 'physical impact' to which *Gotshall* referred does not include a simple physical contact with a substance that might cause a disease at a substantially later time-where that substance, or related circumstance, threatens no harm other than the disease-related risk." *Buckley,* 521 U.S. at 430, 117 S.Ct. 2113.

The majority opinion in this case suggests that a court could accomplish under the "immediate risk of physical harm" prong of the *Gottshall* zone of danger test what the Supreme Court held cannot be done under the "physical impact" prong of the test. Maybe that is a good idea. But this appeal does not present an occasion for such a ruling, and the discussion that bears on this question is (and is conceded to be) dicta.

---

1. The majority opinion for some reason places grandparents within the "immediate" family. On one level, I suppose, that depends on the grandparents. The definition of "immediate family" in law, however, is cast in terms of two consecutive generations. See *Black's Law Dictionary* 620 (7th ed. 1999) ("A person's parents, spouse, children, and siblings."). This is a question that has ramifications. See, e.g., *Baker v. Dorfman,* 2000 WL 1233349, *4 (2d Cir. Sept.1, 2000) (holding that, under New York law, a plaintiff can

recover for emotional injury as a consequence of witnessing serious physical injury done to a member of plaintiff's "immediate family"); *Trombetta v. Conkling,* 82 N.Y.2d 549, 605 N.Y.S.2d 678, 678, 626 N.E.2d 653 (1993) ("[W]hile plaintiff was, without doubt, within the zone of danger when defendants' truck killed her aunt, the claim for the negligent suffering of emotional distress was properly dismissed because plaintiff is not within the deceased's 'immediate family'.").