Gayle HIGGINS, Plaintiff–Appellant,

v.

**METRO–NORTH RAILROAD COMPANY, Defendant–Appellee.**

**Docket No. 01–7704.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 11, 2002.

Decided Jan. 28, 2003.

Charles C. Goetsch, Cahill & Goetsch, P.C., New Haven, CT, for Plaintiff–Appellant.

Carol Sue Barnett, Metro–North Commuter Railroad Law Department, (Richard K. Bernard, General Counsel, on the brief), New York, NY, for Defendant–Appellee.

Before: WALKER, Chief Judge, F.I. PARKER and SOTOMAYOR, Circuit Judges.

JOHN M. WALKER, JR., Chief Judge.

Plaintiff-appellant Gayle Higgins appeals from the May 11, 2001 judgment of the district court for the Southern District of New York (William C. Conner, *District Judge*) granting defendant-appellee Metro–North Railroad Company's motion for summary judgment. Higgins's complaint alleges that her latent multiple sclerosis became symptomatic as a result of stress induced by the verbal and physical harassment of John Militano, a co-worker and supervisor. In particular, Higgins appeals the grant of summary judgment for defendant Metro–North on three claims Higgins brought under the Federal Employers' Liability Act: negligent failure to provide a safe workplace; negligent supervision of Militano; and intentional infliction of emotional distress. The district court granted summary judgment on these claims on the basis that Militano's conduct could not be imputed to Metro–North and that Metro–

North's supervision of Militano had not been negligent. We affirm.

## BACKGROUND

For purposes of this review of summary judgment in favor of defendant, the facts are viewed in the light most favorable to plaintiff. Higgins began working for Metro–North in 1974. In April 1996, she took a position as secretary to Facility Director William Duke at Metro–North's equipment maintenance facility in Harmon, New York. After Duke became ill in April 1997, Higgins worked for both Michael Yaeger and John Militano when they shared the Facility Director position. When Yaeger was appointed Facility Director a few months later, Higgins became his secretary. During this time, Militano was the Superintendent of the Diesel Shop and managed 212 employees who maintain the railroad's rolling stock.

Between 1996 and 1998, Higgins alleges that Militano engaged in a "course of conduct toward Gayle Higgins [that] included both unwanted physical contact that was sexual in nature and outrageous abuse regarding work matters." Militano allegedly yelled and swore at Higgins in front of others about work-related matters on approximately four occasions. Higgins also alleges several incidents in which Militano engaged in sexual banter with her by, for example, telling her that she had a "great ass."

Finally, Higgins alleges five incidents of sexually tinged physical contact by Militano. In the summer of 1997, Militano brushed his hand against Higgins's breast while reaching around her to put out his cigarette in an ashtray. On two occasions in November 1997, Militano poked her in the ribs. Yaeger learned of the second one and told Militano not to behave that way. In April 1998, Militano slapped Higgins's rear end while she was using a fax machine, after which he laughed and ran away. Finally, Higgins alleges that once when she was squatting down at a file cabinet, Militano came up from behind her, put his arms around her waist, startling her such that she fell down. Higgins claims that these incidents made her upset and angry but admits that she never felt physically threatened.

Except for the poking incident that Yaeger observed and inquired about, Higgins did not report these incidents of physical contact to anyone at the time they occurred. It was not until May 1998, while she was on leave recovering from surgery, that Higgins filed a 16–page complaint with Metro–North's Office of Workplace Diversity. The complaint alleged that Higgins had been sexually harassed, subjected to a hostile work environment, and retaliated against by Militano.

Maryann Gormley–O'Connor of Metro–North's Office of Workforce Diversity responded immediately, interviewed numerous people and wrote a thorough report. Gormley–O'Connor concluded that although Militano had engaged in inappropriate behavior, there was no evidence of sexual harassment or retaliation. As a result of the investigation, Militano received a letter informing him that his behavior was unprofessional, warning him that a single repetition could result in his termination and informing him that he had been scheduled for a conflict resolution seminar. By letter Gormley–O'Connor informed Higgins of the action that had been taken against Militano, but also advised Higgins that she should carry out her work in a more professional manner, including utilizing available complaint procedures. Gormley–O'Connor offered a mediation session, but Higgins refused to participate.

Following her surgery, Higgins returned to work in August 1998 but in a different position, working as a secretary for Train Masters Edward Byrne and Peter Hansen in another building on the Harmon site. Higgins alleges that Militano called Byrne's office with abnormal frequency, told her that she "still had a great ass," and "stalked" her on two occasions by driving around the parking lot when she was leaving. Higgins did not bring these incidents to the attention of Yaeger or Gormley–O'Connor, but she may have mentioned aspects of them to Byrne. In late September 1998, Higgins became ill and was diagnosed with multiple sclerosis. In 1999, Higgins stopped working and is currently on permanent disability leave.

## DISCUSSION

On appeal, Higgins claims that the district court erred in granting summary judgment to Metro–North by (1) wrongly finding that, in her intentional infliction of emotional distress claim, Higgins did not at least raise an issue concerning whether Militano's conduct was imputable to Metro–North; and (2) improperly applying the standard for imputing an intentional tort to the two negligence claims. We review grants of summary judgment *de novo,* viewing the evidence in the light most favorable to the non-moving party. *VKK Corp. v. Nat'l Football League,* 244 F.3d 114, 118 (2d Cir.2001). Summary judgment is appropriate if there is "no genuine issue [of] material fact and . . . the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

■■■■ All of Higgins's claims are brought under the Federal Employers' Liability Act ("FELA"). 45 U.S.C. § 51. Because intentional torts are recognized under FELA, *see, e.g., Davis v. Green,* 260 U.S. 349, 351, 43 S.Ct. 123, 67 L.Ed. 299 (1922); *Harrison v. Mo. Pac. R.R. Co.,* 372 U.S. 248, 249, 83 S.Ct. 690, 9 L.Ed.2d 711 (1963), and claims for solely emotional injury are also recognized, *Consol. Rail Corp. v. Gottshall,* 512 U.S. 532, 544–45, 114 S.Ct. 2396, 129 L.Ed.2d 427 (1994), we find that claims of intentional infliction of emotional distress can be brought under FELA.[1]

■■■■ The district court dismissed Higgins's intentional infliction of emotional distress claim because it found Higgins's allegations insufficient to impute to Metro–North liability for Militano's alleged actions. The district court applied the test employed by the Seventh Circuit in *Lancaster v. Norfolk and W. Ry. Co.:* a "FELA plaintiff may prevail in an intentional tort case by showing either that the intentional tort was committed in furtherance of the employer's objectives or that the employer was negligent in hiring, supervising, or failing to fire the employee." 773 F.2d 807, 818 (7th Cir.1985). We consider first whether Militano was acting within the scope of his employment and

---

1. Judge Sotomayor would apply the zone of danger test to intentional infliction of emotional distress claims under FELA. At common law, the zone of danger test applies to negligent infliction of emotional distress claims. It allows a plaintiff to recover for emotional injury caused by fear of physical injury only if the plaintiff was within the zone of danger of physical impact. In *Gottshall,* the Supreme Court held that the zone of dan-

ger test applied in FELA cases to claims of negligent infliction of emotional distress. 512 U.S. at 554, 114 S.Ct. 2396. We have no need to decide whether the zone of danger test also applies in FELA cases of intentional infliction of emotional distress, because the common law requirement that to be actionable such claims be based on conduct that is extreme and outrageous sufficiently disposes of this case.

then whether Metro–North's hiring and supervision of Militano was negligent.[2]

■ Under FELA, liability for the intentional torts of an employee whose tortious acts are committed within the scope of employment will be imputed to the employer under the doctrine of *respondeat superior* but "no liability attaches when an employee acts 'entirely upon his own impulse, for his own amusement, and for no purpose of or benefit to the defendant employer.'" *Gallose v. Long Island R.R. Co.*, 878 F.2d 80, 83 (2d Cir.1989) (quoting *Copeland v. St. Louis–San Francisco Ry. Co.*, 291 F.2d 119, 120 (10th Cir.1961)).

■ It is well settled that sexual harassment "consisting of unwelcome remarks and touching is motivated solely by individual desires and serves no purpose of the employer." *Faragher v. City of Boca Raton*, 524 U.S. 775, 794, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Therefore, the alleged sex-related comments and acts cannot be imputed to Metro–North under this doctrine, leaving only Militano's work-related outbursts to be imputed. However, Higgins only alleges four specific incidents of work-related yelling. In the first incident, Militano allegedly yelled, "You'll fucking get [the ICC list] when I give it to you." The other three incidents are of a

similar nature. Standing alone, these four incidents do not approach the "extreme and outrageous" conduct required to prove intentional infliction of emotional distress. Restatement (Second) of Torts § 46(1) (1965); *see also Atchison, Topeka and Santa Fe Ry. Co. v. Buell*, 480 U.S. 557, 567 n. 13, 107 S.Ct. 1410, 94 L.Ed.2d 563 (1987).

■ The second means of holding an employer liable for intentional conduct under *Lancaster* is to show that the employer was negligent. *Lancaster*, 773 F.2d at 818. In this case, Higgins argues that liability should attach because Metro–North was negligent in supervising Militano. Higgins's claims of negligent supervision and negligent failure to provide a safe workplace require the same showing of negligence. We therefore analyze the second means of holding Metro North liable under *Lancaster* and the direct negligence claims together.

■ In order to demonstrate negligent supervision, Higgins must show that Metro–North "knew or should have known prior to the [incidents] of propensities of [Militano] to commit such [acts]." *Harrison v. Mo. Pac. R.R. Co.*, 372 U.S. 248, 249, 83 S.Ct. 690, 9 L.Ed.2d 711 (1962) (per curiam). Although a relaxed stan-

---

**2.** Plaintiff also argues that Metro–North should be liable because it has a non-delegable duty to provide Higgins a safe workplace. This argument is foreclosed by the Supreme Court's opinion in *Gottshall* in which the Court rejected a similar interpretation of FELA that would have "impose[d] a duty to avoid creating a stressful work environment, and thereby dramatically expand employers' FELA liability to cover the stresses and strains of everyday employment." 512 U.S. at 554, 114 S.Ct. 2396.

We also note that plaintiffs do not raise the argument that liability should be imputed to Metro–North because Militano was "aided in accomplishing the tort by the existence of the agency relation," Restatement (Second) of

Agency § 219(d) (1958); *cf. Faragher v. City of Boca Raton*, 524 U.S. 775, 801–03, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). But we doubt that it would have been successful. Militano was Higgins's direct supervisor for only a few months when he and Yaeger shared the position of Facility Director and there is no evidence that Militano directly used his position of authority. Also, the availability of Metro–North's sexual harassment procedure might provide a defense to imputation in the agency context despite FELA's general bar to contributory negligence defenses. *Cf. id.* at 806–07, 118 S.Ct. 2275 (nonpursuit of internal remedial procedures for sexual harassment analyzed as "failure in a coordinate duty to avoid or mitigate harm").

dard of proof of negligence applies in FELA actions, *see Ulfik v. Metro–North Commuter R.R.*, 77 F.3d 54, 58 (2d Cir. 1996), we find that, based on the facts alleged by Higgins, no reasonable jury could find that Metro–North was negligent.

Metro–North certainly knew that Militano had difficulty controlling his temper. However, the record indicates that his outbursts were work-related and therefore would not have put Metro–North on notice that he was prone to sexually harass his co-workers. As is discussed above, imputing to Metro–North only the incidents of yelling is insufficient to make out an intentional infliction of emotional distress claim. Similarly, these incidents are insufficient to demonstrate negligence on the part of Metro–North because it is not foreseeable that co-workers would be harmed by such outbursts.

Higgins provides no evidence that Metro–North was aware that Militano was prone to sexually harass his co-workers prior to the alleged unwanted physical contacts and all but one of the alleged sexually-charged comments. There had been two prior complaints about Militano. Yaeger reported that Carl Walz had complained that Militano touched his rear end while trying to take time cards from Walz and that Lew Erwin complained that Militano had poked Erwin while publicly reprimanding him for not enforcing Metro–North's personal protective equipment standards. Yaeger investigated the incident with Erwin but was not able to confirm that Militano had poked Erwin, and Erwin eventually dropped his complaint. Although Walz's complaint alleges a violation of his person, there was no suggestion that the touching was in any way sexual. In any event, these instances of inappropriate behavior toward men did not put Metro–North on notice that Militano was

likely to commit acts of sexual harassment toward women. Nor did Higgins report the incidents of unwanted sexual contact by Militano as they occurred. As the district court noted, Higgins did not tell anyone about the touching of her buttocks or breasts at the time. The only incident that Higgins's supervisor Yaeger learned of was the rib-poking.

Thus, Metro–North knew of only three incidents of unwanted contact—the poking of Erwin, one poking of Higgins, and the inappropriate touching of Walz—which is not enough to put Metro–North on notice that Militano was prone to sexual harassment. *See Williams v. Nat'l R.R. Passenger Corp.*, 161 F.3d 1059, 1063 (7th Cir. 1999) (affirming summary judgment for defendant where plaintiff provided no evidence that railroad actually knew or should have known of defect); *Moody v. Boston and Me. Corp.*, 921 F.2d 1, 4–5 (1st Cir.1990) (same); *cf. Ulfik*, 77 F.3d at 58 (holding that Metro–North's "direct knowledge of physical ailments" from inhaling fumes satisfied requirement of foreseeability); *Syverson v. Consol. Rail Corp.*, 19 F.3d 824, 827 (2d Cir.1994) (holding that Conrail's knowledge that area was "magnet for vagrants" put it on notice of risk to safety of workers); *Lancaster*, 773 F.2d at 811, 820 (pattern of supervisory abuse including extreme menacing, goosing, and striking with sledgehammer could have provided notice of risk). Because Higgins has not demonstrated that Metro–North was aware of any particular threat posed by Militano, Higgins cannot prove that the railroad was negligent with respect to its supervision of him.

Any suggestion that Metro–North's general supervision practices placed its employees at an unreasonable risk of sexual harassment is rebutted by the undisputed facts regarding Metro–North's significant anti-discrimination program. Gormley–

O'Connor noted in her report on Higgins's sexual harassment complaint that Higgins "made a personal decision not to utilize the widely disseminated internal complaint procedure." When Higgins eventually did file a complaint, Metro–North undertook a thorough investigation which concluded that, while Militano had acted unprofessionally at times, he had not sexually harassed Higgins. Metro–North further offered to mediate between Higgins and Militano, and warned Militano by letter that "a single future" instance of unprofessional conduct "will be disciplined severely up to and including dismissal" and scheduled him for a conflict resolution seminar. Finally, because Higgins did not report the alleged August and September 1998 incidents, Metro–North could not have been negligent in failing to respond. The presence of a mechanism at Metro–North to address issues of sexual harassment and Higgins's failure to fully use this mechanism distinguish this case from those that have found that a poor supervision system provided sufficient evidence of negligence to present the case to a jury. *See Smith v. Nat'l R.R. Passenger Corp.*, 856 F.2d 467, 469–70 (2d Cir.1988) (denying judgment notwithstanding the verdict because but for defendant's negligent failure to follow rule on reports of misconduct, shooting by disgruntled employee might have been prevented); *cf. Williams v. Long Island R.R.*, 196 F.3d 402, 407 (2d Cir.1999) (absence of convenient alternative means of reaching platform could support inference that Metro–North was negligent under FELA's relaxed negligence standard).

To recap, the four alleged incidents of work-related yelling that can be imputed to Metro–North under the doctrine of *respondeat superior* are insufficient to make out a case for intentional infliction of emotional distress. Viewed in the light most favorable to Higgins, she has failed to demonstrate that Metro–North was negligent with respect to Militano. She has not shown that Metro–North knew or should have known that Militano was prone to commit acts of sexual harassment before the alleged incidents occurred. Moreover, the evidence of Metro–North's extensive complaint program negates any suggestion that Metro–North's general employee supervision practices negligently contributed to the alleged acts of harassment. Accordingly, the district court appropriately granted summary judgment in favor of Metro–North.

## CONCLUSION

We affirm the decision of the district court granting summary judgment to Metro–North dismissing plaintiff's suit.

SOTOMAYOR, J., concurring in the result.

The majority, consistent with the district court's approach, affirms the grant of summary judgment on plaintiff's direct negligence and intentional infliction of emotional distress claims on the grounds that harassment of plaintiff by Militano was not within the scope of employment and that no reasonable jury could find Metro–North negligent because Metro–North did not have notice of Militano's propensity to harass employees. I disagree. I would affirm, however, on the grounds that plaintiff's emotional injuries, and consequent physical manifestations, are not compensable under FELA because they fail to satisfy the "zone of danger" test developed in *Consolidated Rail Corp. v. Gottshall*, 512 U.S. 532, 114 S.Ct. 2396, 129 L.Ed.2d 427 (1994).

The majority concludes that "Higgins provides no evidence that Metro–North was aware that Militano was prone to sexually harass his co-workers prior to the

alleged unwanted physical contacts and all but one of the alleged sexually-charged comments." But this is not a Title VII sexual harassment case, nor is the underlying tort based on sexual harassment.[1] Instead, plaintiff's claim is that she was repeatedly yelled at by Militano and touched inappropriately by him, and that this conduct in its entirety either amounted to intentional infliction of emotional distress or caused her harm for which Metro–North is liable because its negligent supervision of Militano permitted the harassment to occur. Although an employer's knowledge may be probative evidence in an negligent supervision claim, I find the majority's sole focus on whether Metro–North was aware of any propensity of Militano to harass his co-workers *sexually* to be inappropriate.

The majority notes that Yaeger, a supervisor, admitted knowing that Militano had been accused of inappropriate physical contact with two other employees, Carl Walz and Les Erwin. While Yaeger was never able to determine whether or not the physical contact with Erwin had occurred, he admitted that he "did not counsel [Militano] in a corrective fashion or from a disciplinary standpoint." Yaeger also agreed when asked that "there [were] times when John Militano has had difficulty in controlling his anger in the shop," and further stated that he had spoken to Militano on several occasions about "better handling [his] subordinates or better handling how to speak to people." Indeed, the majority recognizes that "Metro–North certainly knew that Militano had difficulty controlling his temper." Given this evidence and the nature of plaintiff's claim, a reasonable jury could conclude that Metro–North knew or should have known that

Militano had a propensity to act abusively toward employees.

Furthermore, while I do not disagree with the majority's conclusion that "[e]xcept for the poking incident that Yaeger observed and inquired about, Higgins did not report these incidents of physical contact to anyone at the time they occurred," taken together, there is evidence in the record suggesting that Metro–North may have been aware of several of the incidents involving Militano's alleged abuse of plaintiff well before her formal complaint in May 1998, and failed to take any action to prevent the situation from escalating.

Drawing all inferences in the light most favorable to plaintiff, the non-moving party, the record contains the following evidence. Plaintiff testified that in 1996, her supervisor, William Duke, witnessed an incident in which Militano was "screaming his head off [at plaintiff] and Billy [Duke] just couldn't believe it." After plaintiff told Militano not to yell at her, Militano "started laughing and saying you're such an easy target. I was only kidding." Plaintiff claims she was very upset. It is also undisputed that Yaeger witnessed an incident involving Militano poking plaintiff in November 1997, asked plaintiff if she liked his conduct, and allegedly promised to put an end to Militano's conduct after plaintiff told him "No. But I can't get him to stop." While Yaeger did talk to Militano about the incident, plaintiff testified that in March 1998, after the poking incident, Militano put his arms around plaintiff's waist while she was kneeling in front of a file cabinet, startling her, and also "slapped [her] fanny at the ... fax machine." Finally, when plaintiff returned to work in August 1998, after formally reporting the harassment in May 1998, she

---

[1]. Although the district court also approached plaintiff's claims through the lens of sexual harassment, the allegations of her complaint make clear that her complaints about Militano are not limited to sexual harassment.

claims that Militano told her she had a "great ass," repeatedly called the trainmaster's office where she was working, and circled around the parking lot as she was leaving on two occasions, leading her to feel that she was being stalked. Indeed, plaintiff's supervisor at that time, Edward Byrne, noted an increase in the number of calls Militano made to the office after she began working there and stated that Militano visited the office a number of times; Byrne could not "recall ever seeing [Militano] in our office prior to [plaintiff] coming in." Byrne further stated in his deposition that after plaintiff left, Militano largely stopped visiting the office.

Accordingly, plaintiff alleges that Metro–North was aware that Militano had a propensity to harass employees verbally and physically, that she suffered both types of harassment at his hands, and that she was injured by this conduct. We have repeatedly held that "an employer breaches its duty under FELA 'if it knew or should have known of a potential hazard in the workplace, and yet failed to exercise reasonable care to inform and protect its employees.'" *Williams v. Long Island R.R. Co.*, 196 F.3d 402, 406 (2d Cir.1999) (quoting *Ulfik v. Metro–North Commuter R.R.*, 77 F.3d 54, 58 (2d Cir.1996)); *accord Syverson v. Consol. Rail Corp.*, 19 F.3d 824, 826 (2d Cir.1994). "Reasonable care is determined in light of whether or not a particular danger was foreseeable." *Syverson*, 19 F.3d at 826. "The test is 'whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in pro-

ducing the injury.'" *Williams*, 196 F.3d at 406–07 (quoting *Ulfik*, 77 F.3d at 58).[2] While this is a somewhat close case, "a relaxed standard of negligence applies in FELA cases in this Circuit," *id.* at 406, and a reasonable jury could conclude from this record that Metro–North was aware of a particular threat posed by Militano to plaintiff and thus that there was a basis for imputing liability to Metro–North. *Cf. Gadsden v. Port Auth. Trans–Hudson Corp.*, 140 F.3d 207, 209 (2d Cir.1998) ("Under the FELA, 'the case must not be dismissed at the summary judgment phase unless there is absolutely no reasonable basis for a jury to find for the plaintiff.'" (quoting *Syverson*, 19 F.3d at 828)).

I concur in the result affirming the grant of summary judgment, however, on the ground that plaintiff has failed to satisfy the requirements of the "zone of danger" test articulated in *Gottshall*, 512 U.S. at 547–48, 114 S.Ct. 2396, which I conclude applies to all of plaintiff's negligence and intent-based claims, because they are all claims for recovery based on mental or emotional harm.[3]

In *Gottshall*, the Supreme Court addressed "the proper standard for evaluating claims for negligent infliction of emotional distress that are brought under the Federal Employers' Liability Act." *Id.* at 535, 114 S.Ct. 2396. Although the claims at issue in *Gottshall* were negligent infliction of emotional distress claims, the Court went on broadly to discuss the claim in terms of the types of *injuries* that are compensable under FELA: "The injury

---

**2.** Similarly, under the common law tort of negligent supervision, an employer may be liable for negligent supervision if an employee suffers an injury that "was a reasonably foreseeable consequence of the [employer's] conduct." *Richichi v. Constr. Mgmt. Techs., Inc.*, 244 A.D.2d 540, 664 N.Y.S.2d 615, 617 (2d Dep't 1997).

**3.** "[U]nlike the question of whether there is negligence or not, the inquiry into the weightiness of the physical risk to which a plaintiff is exposed, would, even in FELA cases, be performed by courts and not primarily by juries." *Nelson v. Metro–North Commuter R.R.*, 235 F.3d 101, 113 n. 12 (2d Cir.2000).

we deal with here is mental or emotional harm (such as fright or anxiety) that is caused by the negligence of another and that is not directly brought about by a physical injury, but that may manifest itself in physical symptoms." *Id.* at 544, 114 S.Ct. 2396; *see also id.* at 542, 114 S.Ct. 2396 ("Our task today is determining under what circumstances emotional distress may constitute 'injury' resulting from 'negligence' for purposes of [FELA]."). The Court held, in light of the common law and "FELA's central focus on physical perils," *id.* at 555, 114 S.Ct. 2396, that

> allowing recovery for negligently inflicted emotional *injury* as provided for under the zone of danger test best harmonizes these considerations. Under this test, a worker within the zone of danger of physical impact will be able to recover for emotional injury caused by fear of physical injury to himself, whereas a worker outside the zone will not. Railroad employees thus will be able to recover for *injuries*—physical and emotional—caused by the negligent conduct of their employers that threatens them imminently with physical impact.

*Id.* at 556, 114 S.Ct. 2396 (emphasis added).

Several years later, the Supreme Court considered the issue of the scope of the zone of danger test under FELA in *Metro–North Commuter Railroad Co. v. Buckley,* 521 U.S. 424, 117 S.Ct. 2113, 138 L.Ed.2d 560 (1997), holding that "a railroad worker negligently exposed to a carcinogen . . . but without symptoms of any disease" cannot recover for negligently inflicted emotional distress under FELA "unless, and until, he manifests symptoms of a disease." *Id.* at 426–27, 117 S.Ct. 2113. In so holding, the Court observed that "the words 'physical impact' do not encompass every form of 'physical contact.'" *Id.* at 432, 117 S.Ct. 2113. The Court also noted that the common law permitted recovery for emotional distress that resulted from a physical injury or disease, and concluded that allowing recovery where there was some physical contact—there, exposure to asbestos—but no claim that the contact had caused any physical damage yet, would expose employers to too great a risk of unlimited and unpredictable liability. *Id.* at 431–37, 117 S.Ct. 2113.

It is with these decisions in mind that I approach plaintiff's claims. I would hold that the zone of danger test applies to plaintiff's intentional infliction of emotional distress claim, and, given the lack of any claim of physical injury resulting from Militano's touching of plaintiff and plaintiff's unambiguous testimony that she never feared for her physical safety, would find that her claim fails.[4] While plaintiff contends that the common law tort of intentional infliction of emotional distress, which is variously characterized as "outrageous" or "extreme," is sufficiently rigorous to guarantee the authenticity of her emotional distress allegations, this approach takes the focus away from the core concern of FELA as described in both *Gottshall* and *Buckley:* that employees must suffer some kind of physical harm, impact, or invasion

---

**4.** Plaintiff does allege that Militano touched her on several occasions. We have recognized, however, that *"Buckley* has restated the traditional rule that an event cannot constitute a physical impact, even if it entails contact, unless it has a physically harmful effect on the body." *Nelson v. Metro–North Commuter R.R.,* 235 F.3d 101, 110 (2d Cir.2000).

Plaintiff claims that she was angered and upset by the "whole situation" with Militano and that this distress eventually led to an onset of Multiple Sclerosis. There is no claim or evidence that the touching alone had any physically harmful effect; indeed, plaintiff testified that she suffered no physical injury from Militano's contact.

before they may recover under the Act.[5] *Cf. Gottshall,* 512 U.S. at 556–57, 114 S.Ct. 2396 (rejecting the common law "relative bystander" test in part on the grounds that "we discern from FELA and its emphasis on protecting employees from physical harms no basis to extend recovery to bystanders outside the zone of danger").

Turning to plaintiff's two direct negligence claims, I agree with the Tenth Circuit that "the substance of [a plaintiff's] injury is the focus of our inquiry in determining whether the zone of danger test applies." *Smith v. Union Pac. R.R.,* 236 F.3d 1168, 1171 (10th Cir.2000). As the Tenth Circuit noted in *Smith,* "[a] close reading of [*Gottshall*] reveals that the Court focused on whether emotional *injuries* were compensable under FELA, rather than upon the specific cause of action." *Id.* (emphasis added) (citing *Gottshall,* 512 U.S. at 541, 544, 545–46, 114 S.Ct. 2396).

Thus, while the claim in *Smith* was that the railroad had been negligent in requiring the plaintiff to work a rotating shift that resulted in a sleep disorder and severe depression, ultimately leading to an exacerbation in the plaintiff's spinal injury, *id.* at 1170, and plaintiff's claims in the instant case are that the railroad negligently supervised Militano and failed to create a safe workplace, I do not see this distinction as material. Instead, if "we look to the substance of [plaintiff's] injury and the nature of [Metro–North's] conduct to determine whether [plaintiff] must satisfy the [zone of danger] test," *id.* at 1171, I find that plaintiff has alleged that she suffered stress caused by Militano and that the railroad's negligent conduct ultimately triggered her Multiple Sclerosis. In short, it is the nature of the injury claimed, rather than the characterization of the tort, that is dispositive in my view.

Accordingly, I would hold that the zone of danger test applies to all plaintiff's claims, and conclude that her claims fail because she was not within that zone of danger in light of her testimony that she never suffered or feared any physical harm from Militano.

---

5. While I recognize that this may preclude recovery for purely emotional harm even where the conduct alleged is extreme and outrageous, this is not a sufficient basis in my view to conclude that the zone of danger test does not apply. The Supreme Court emphasized in *Gottshall* that while FELA was passed for humanitarian purposes, "[t]hat FELA is to be liberally construed ... does not mean that it is a workers' compensation statute. We have insisted that FELA 'does not make the employer the insurer of the safety of his employees while they are on duty. The basis of his liability is his negligence, not the fact that injuries occur.'" *Gottshall,* 512 U.S. at 543, 114 S.Ct. 2396 (quoting *Ellis v. Union Pac. R.R.,* 329 U.S. 649, 653, 67 S.Ct. 598, 91 L.Ed. 572 (1947)).