James **MURPHY**, Plaintiff,

v.

**METROPOLITAN TRANSPORTATION AUTHORITY, Defendant.**

No. 05 Civ. 0376(CM).

United States District Court, S.D. New York.

March 26, 2008.

Philip J. Dinhofer, Philip J. Dinhofer, LLC, Rockville Centre, NY, for James Murphy.

Ronald E. Joseph, Erika Catherine Browne, James M. Woolsey, III, Landman Corsi Ballaine & Ford PC, New York, NY, for Metro. Transp. Authority.

DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

McMAHON, District Judge.

I. Introduction

Plaintiff James Murphy brings this action against his former employer, the Metropolitan Transportation Authority (MTA), alleging a series of injuries sustained by Murphy prior to his retirement in 2006, and seeking to hold the MTA liable under the Federal Employers' Liability Act (FELA). The MTA now moves this court for summary judgment as to all claims.

Defendant's motion is granted in part, and denied in part.

II. Background

Plaintiff James Murphy is a retired twenty-year veteran of the Metropolitan Transportation Authority Police Department (MTAPD). Pl.'s Rule 56.1 Statement, ¶ 1. Prior to his injuries and recent retirement, Murphy had a history of good health and was known for putting in long overtime hours. *Id.* His primary post was the late shift at Penn Station, and during the period from 2003–04 he also held a guard detail at the First Avenue and NYU Medical Center portal. *Id.* ¶ 5.

The Defendant in this action is Murphy's former employer, the Metropolitan Transportation Authority (MTA), a common carrier within the meaning of the Federal Employers' Liability Act (FELA). *Greene v. Long Island R.R. Co.*, 99 F.Supp.2d 268 (E.D.N.Y.2000) (holding that the MTA is subject to suits under FELA), *aff'd*, 280 F.3d 224 (2d Cir.2002), *cert. denied, Metro. Transp. Auth. v. Greene*, 538 U.S. 1031, 123 S.Ct. 2073, 155 L.Ed.2d 1060 (2003).

Murphy's tort claims arise out of a knee injury he suffered on April 18, 2003, and a series of alleged threats made by his supervisor, Sergeant Joseph Camean (Camean). The facts as described are either undisputed, or presented in the light most favorable to Murphy.

a. *The knee injury*

At approximately 9:30 pm on Friday, April 18, 2003, Murphy was on his shift in the Penn Station terminal, on the Long Island Railroad (LIRR) level. Pl.'s Rule 56.1 Statement, ¶ 2. He was in the process

of assisting an extremely intoxicated person when he received a "10–85" call from fellow officer Edward O'Flaherty. *Id.*

A "10–85" is listed in the MTAPD manual as meaning, "Request Additional Unit/ Meet." Def.'s Ex. 10. The parties appear to agree that a 10–85 is regarded as the second "highest" or second most urgent call an officer can make, the highest being a "10–13." (A 10–13 is listed as meaning "Assist Police Officer—EMERGENCY." *Id.*). The parties disagree about whether a 10–85 should be characterized as an "emergency" or "non-emergency" call.

Upon receiving O'Flaherty's call, Murphy began running toward its source, Tracks restaurant, charting a diagonal path across the terminal. Pl.'s Rule 56.1 Statement, ¶ 2. When Murphy saw that his path was blocked by an arrangement of stanchions—rope-supporting poles put in place to form lines in front of the ticket counters—Murphy made a sharp pivot mid-run, in order to head diagonally in another direction. *Id.* ¶ 3. While making this maneuver, Murphy felt an unfamiliar "pop" in his knee. *Id.* He continued toward the source of the call, but when he got there discovered that other officers had already arrived. *Id.*

After the situation at Tracks was resolved, Murphy continued his regular shift. After two hours he realized that the pain in his knee was not going away, and in fact was becoming "excruciating." *Id.* Murphy had no prior knee injuries or pain. He notified his commanding officer and was eventually taken to the emergency room in an ambulance for the injury. *Id.*

Murphy later learned that O'Flaherty had placed the 10–85 call while attempting to remove an obstreperous patron from the Tracks restaurant. *Id.* ¶ 4. O'Flaherty was a canine officer, which meant that he had a leashed police dog with him at all times. In order to remove the patron,

O'Flaherty had placed his right hand on her arm, while in his left hand he held his partner's leash. As the dog began to pull on the leash, and the woman resisted his grip, O'Flaherty began to fear a confrontation between his wards. In order to alleviate the situation, he placed the 10–85. *Id.; see also* Pl.'s Ex. 16, Deposition of Edward O'Flaherty.

### b. *The gun threats*

Murphy also alleges a wholly distinct injury arising out of distinct facts. In mid 2003 Joseph Camean (Camean) was promoted to the rank of sergeant and given a supervisory post in Penn Station. This post brought Camean into regular contact with the Plaintiff.

Plaintiff alleges that, soon after Camean was promoted, he led a group of fellow officers (known collectively as "the Wolf Pack") in a violent spree targeting the homeless. *Id.* ¶ 6. In support of his allegations Plaintiff submits a series of civilian complaints lodged against Camean and members of his group, all dated during the period between Fall 2003 and March 24 of 2004. *See* Pl.'s Exs. 22–54.

On January 18, 2004, three members of the "Wolf Pack" were involved in the beating of one Maurice Cherry. After reports from a number of witnesses, an investigation was launched by internal affairs. Plaintiff alleges that, as a result of this investigation, Camean sought to shield one of the alleged participants in the beating, an Officer Koenig, from scrutiny, by having him reassigned to Plaintiff's First Avenue post. *Id.* ¶ 9.

To effectuate this plan, it is alleged, Camean began harassing Murphy in a number of ways. *See id.* ¶¶ 9–13. Murphy alleges that Camean and his group obtained a picture of him sleeping on the job, and attempted to use that picture to

blackmail him. More seriously, he claims to have been threatened by Camean on four occasions with a gun.

One such threat occurred on February 18, 2003. Plaintiff alleges that he was working the midnight shift at Penn Station, performing various administrative tasks. He claims that, after faxing a document, he turned around to find Camean pointing his gun at his chest, with his finger on the trigger, laughing.

Another incident allegedly occurred on March 18 or 19. Murphy was sitting at a desk doing paperwork, while—unbeknownst to him—Camean snuck up behind him and aimed his gun at Murphy's head, apparently for the amusement of himself and other officers present in the room. Murphy was not aware that anything had happened, but on March 23 another officer anonymously reported the March 19 incident to internal affairs. *Id.* ¶ 10.

The next event allegedly occurred only a few days later, on either March 23 or 24. Plaintiff claims that, while walking down a hallway he encountered Camean, who drew his gun and pressed it against Murphy's stomach, while "maniacally laughing." *Id.*

Plaintiff does not recall the exact date of the fourth incident, though it allegedly occurred between January 18 and March 24. In this incident, Camean pulled his gun, not on Murphy, but on one Officer Lee (who was allegedly a part of Camean's Wolf Pack). Officer Lee, who was trained in martial arts, made a move to disarm Camean, and in the ensuing struggle Camean's gun wound up pointed at Plaintiff's face. Lee allegedly said at the time that, "If a round went off, [Murphy] would have gotten it." *Id.*

Despite being in constant fear for his life throughout the period from roughly January 18 through March 24, Murphy never reported Camean's behavior. It was originally uncovered as part of the investigation into the Maurice Cherry beating, which had drawn attention to the pattern of police violence reported against Camean and those whom he supervised. *See generally* Pl.'s Exs. 10, 19–21, 55, 57–58, 61, 69, 77, 83–86, 88 (Deposition of Lieutenant Timothy Harmon), In addition to the civilian reports and the anonymous call concerning the March 19 gun incident received by internal affairs, Chief Finneran of internal affairs also received, on or about March 19, an anonymous letter, which alleged that Camean had pulled his gun on another officer. Pl.'s Ex. 4. A Lieutenant Pattison also admitted to having witnessed Camean with his gun un-holstered inappropriately. Pl.'s Ex. 90.

Sometime during the course of the investigation into the Cherry beating, the MTA picked up on this pattern. On March 24, internal affairs contacted Murphy regarding the March 19 incident, about which internal affairs had received an anonymous phone call. Pl.'s Ex. 59. Plaintiff insisted that he was unaware of that incident, but when pressed, told internal affairs about all of the other gun menacing incidents, and about Camean's violent and sadistic disposition. Pl.'s Ex. 8.

Upon learning this information the MTA removed Camean from his post. Pl.'s Rule 56.1 Statement, ¶ 16. Camean was eventually indicted and pled guilty for his role in covering up the Maurice Cherry beating. *Id.* He is no longer employed by the MTA.

### c. *The order to return to Penn Station*

Plaintiff was reassigned to the Merrick, Long Island station, after March 24, 2004, while the Camean investigation continued. In late September of that year, the MTA determined that Murphy should return to his Penn Station post. Pl.'s Rule 56.1 Statement, ¶¶ 18–19. Although Camean

and some members of the alleged Wolf Pack were no longer stationed there, other members of that group were. *Id.* Murphy feared that there would be reprisals from those loyal to Camean for Murphy's role in the internal affairs investigation. *Id.*

When Murphy was told that he had to return to Penn Station he appeared visibly shaken and began to cry. *Id.* On the date he was due to return, he wrote a letter to his superiors indicating that he would not return, as he was in fear for his life. Pl.'s Ex. 87. Murphy has not worked for the MTA since that time, and is now retired.

### d. *Procedural history*

Murphy filed his complaint on January 14, 2005, alleging that the MTA is liable to him under the Federal Employers' Liability Act (FELA), for negligently failing to provide him with a safe work environment. His first cause of action relates to his knee injury. His second and third causes of action relate to the emotional distress he suffered as a result of Camean's gun threats, and as a result of the MTA's insistence that he return to work at Penn Station.

The MTA now moves for summary judgment, arguing that Plaintiff's claims fail, as a matter of law, to establish liability under FELA. Plaintiff cross-moves for leave to amend his complaint so that he may more fully articulate his cause of action arising from the MTA's insistence that he return to work at Penn Station.

For the reasons stated below, Defendant's motion is GRANTED as to the first and third causes of action (knee injury and requests to return to Penn Station), and DENIED as to the second cause of action (gun threats). Plaintiff's cross-motion to amend is DENIED as futile.

### III. Discussion

### a. *Summary judgment standard*

A motion for summary judgment may be granted, "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In addressing a motion for summary judgment, the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in its favor. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Whether any disputed issue of fact exists is for the court to determine. *Balderman v. U.S. Veterans Admin.*, 870 F.2d 57, 60 (2d Cir.1989).

Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the non-moving party must present "specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e)(2). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998). Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202(1986).

Finally, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material

facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the non-movant.

### b. *Federal Employers' Liability Act (FELA)*

■ FELA differs significantly from other workers' compensation statutes, which typically "provided[ ] relief without regard to fault." *Norfolk S. Ry. Co. v. Sorrell,* 549 U.S. 158, ——, 127 S.Ct. 799, 805, 166 L.Ed.2d 638 (2007). Under FELA, a worker employed by a railroad can recover damages only if he can establish that he suffered an injury that resulted *"in whole or in part* from the negligence of any of the officers, agents, or employees" of the railroad. 45 U.S.C. § 51 (emphasis added). FELA further provides that a railroad worker's contributory negligence does not bar recovery, but simply diminishes the damages to be awarded "in proportion to the amount of negligence attributable to such employee." 45 U.S.C. § 53.

■ In *Rogers v. Missouri Pacific Railroad Co.,* 352 U.S. 500, 506, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957), the Supreme Court interpreted the "in whole or in part" language in FELA to impose liability on a railroad when the its negligence "played any part, even the slightest, in producing the injury or death for which damages are sought." The Second Circuit has interpreted *Rogers* as giving rise to a "relaxed standard for negligence as well as causation." *Williams v. Long Island R.R. Co.,* 196 F.3d 402, 406 (2d Cir.1999). While FELA is not a strict liability statute, a plaintiff may survive summary judgment on less of a showing of negligence and causation than required under the common law. *Johnson v. Long Island R.R. Co.,*

2007 WL 60414, at *3 (S.D.N.Y. Jan.4, 2007) (collecting cases).

■ A railroad may be liable for an unsafe workplace under FELA "when it knows or should know of a potential hazard in the workplace, yet fails to exercise reasonable care to inform and protect its employees. Reasonable care is determined in light of whether or not a particular danger was foreseeable." *Syverson v. Consol. Rail Corp.,* 19 F.3d 824, 826 (2d Cir.1994) (internal quotation omitted). Foreseeability in FELA actions "requires proof of actual or constructive notice to the employer of the defective condition that caused the injury." *Hairston v. Long Island R.R. Co.,* 2003 WL 21254196, at *5 (S.D.N.Y. May 30, 2003) (citing *Gallose v. Long Island R.R. Co.,* 878 F.2d 80, 85 (2d Cir.1989)).

### c. *Plaintiff's claims*

#### i. The knee injury

Murphy asserts two theories of MTA's negligence with respect to his knee injury. First, Murphy argues that the MTA provided an unsafe work environment when it negligently placed the stanchions that caused him to make the sudden pivot that he claims injured his knee. Alternatively, Murphy argues that O'Flaherty was negligent when he placed the 10–85 call, which Murphy argues was unnecessary.

#### 1. Placement of the stanchions

■ In order for the placement of the stanchions to be negligence, it has to be shown that they were placed in a manner that created an unreasonable risk of harm. Elements that a trier of fact may consider in determining whether a risk is unreasonable, or is a risk that a reasonable person would not create, are (1) the likelihood that harm will eventuate and (2) the cost of preventing that harm, including the loss of

any benefits the risk-creating behavior might yield.

■ Here, the activity that Plaintiff calls negligent is the placement of rope-supporting poles. These poles are not analogous to "typical" workplace hazards—e.g., a puddle of water, a patch of ice, a pile of debris, a defective switch—for a number of reasons. First, all of the "usual suspects" listed above serve no purpose; a puddle or patch of ice accumulates through inadvertence; a switch or a manhole cover is made no more useful by being defective. These are conditions that ought to be removed, however slight the risk that they may cause injury, for the simple reason that there is no good reason to have them as they are.

Here, by contrast, the stanchions are purposely placed, and for a good reason. The stanchions shepherd what might otherwise be a throng of people into a line. If anything, their presence renders the waiting area safer rather than more dangerous. Plaintiff has suggested no way in which the arrangement or placement of these stanchions is unreasonable or creates an unreasonable risk. For instance, Plaintiff does not allege, or present any evidence, that the stanchions were arranged in a manner that made them unnecessarily dangerous.

Plaintiff's only argument is that, while the stanchions as arrayed may serve a useful purpose during "peak" hours, when the station is crowded, leaving them in place during non-peak hours is negligent, because at that point they serve no purpose, making any risk they create unreasonable. But assuming that it would be negligent to leave the stanchions in place at, say, 3:30 am on a Tuesday morning, there can be no dispute that the stanchions were serving their intended purpose at the time of the accident—9:30 pm on a Friday night. The station was crowded at the time of Plaintiff's injury, Plaintiff so testified. *See* Pl.'s Exs. 12, 15. Thus, Plaintiff's argument about the alleged negligence of leaving the stanchions in place when the station is not busy is irrelevant to the facts at bar.

The second major difference between these stanchions and the typical workplace hazard is that the existence of the alleged "hazard" was well known to the Plaintiff. The fact that a patch of "black" ice is nearly invisible to casual observation greatly increases the risk that someone will slip on it; likewise, a non-apparent defect in a switch significantly increases the risk that someone will be injured when attempting to throw it.

Here, by contrast, any risk created by the placement of the stanchions was significantly reduced by their plain visibility. Plaintiff does not allege, or present any evidence, that the stanchions were out of their usual position. This factor is especially significant in light of the fact that Murphy worked in their close proximity for a number of years, and was clearly on notice as to both the existence of the stanchions and their configuration.

Taken together, the evidence shows that these stanchions presented only a very slight risk that a person would be injured in his attempt to avoid them; and that the cost of removing these stanchions—and then replacing them several times a day, depending on whether or not the terminal was at some undefined level of busy-ness—would be excessive in light of that risk. And of course the biggest cost is the loss of the benefit these stanchions provide. It appears extremely likely that the stanchions—and the function they serve of ordering crowds into lines rather than allowing them to blossom haphazardly in all directions—actually *reduce* the risk to employees like Plaintiff who may encounter

the perceived need to run. And this just points out the absurd corollary of plaintiff's theory with respect to the stanchions: namely that the MTA should be held liable for failing to provide Murphy with a clear running path between points in Penn Station at 9:30 pm on a Friday night. Tort law will not incent people to do the impossible, or hold them liable for failing to achieve it.

Given the unlikelihood of the injury suffered by Plaintiff and the benefit conferred by the presence of the stanchions (as well as the attendant costs in removing them), I find that, as a matter of law, the MTA was not negligent in the placement of the stanchions, and that Plaintiff has raised no issue of material fact that could be resolved in favor that would change the outcome.

2. The 10–85 call

■ The next question is whether Defendant may be held liable for the negligence of Officer O'Flaherty, if any such negligence exists. Plaintiff argues that it was negligent for O'Flaherty to place the 10–85 call, and but for the placement of that call, plaintiff would not have injured his knee.

Plaintiff's theory is troubling for a number of reasons. Broadly speaking, he asks this court to allow liability to attach to a police officer's choice to use one radio code rather than another when confronted with a *sui generis,* potentially hostile, situation requiring an immediate decision. The specter of this sort of liability would place officers in a nearly impossible position whenever they were required to use their judgment in requesting assistance. This result is especially perverse considering that Plaintiff is alleging negligence for O'Flaherty's *abundance,* rather than lack, of caution. If making a call for assistance when it might not be absolutely necessary

created a jury question, there would be an incentive for officers not to make any call at all, which would in turn create dangers far greater than the danger that an fellow officer will be injured when attempting to respond. Negligence liability should not be used to encourage further, greater negligence.

Fortunately, this result can be avoided—even under FELA's relaxed negligence and causation standards—because Plaintiff has failed to raise a jury question with respect to either negligence or causation. As to negligence, Plaintiff presents no evidence that a 10–85 call was unreasonable in this situation, beyond his own opinion testimony that he does not believe this was the right call to make. He also does not tell the court what O'Flaherty should have done instead, and the list of radio 10 calls submitted by the parties does not reveal an alternative, more appropriate call for the situation in which O'Flaherty found himself. *See* Def.'s Ex. 10.

Most important, however, Plaintiff does not suggest how any risk created by O'Flaherty's choice of call was so great as to require an alternative course of action by the MTA. Behavior is only negligence if the likelihood that harm will occur is not justified by the benefits conferred by the behavior. The risk that an officer responding to the call would be injured while running zig-zag toward the source of the call was extremely slight. Police officers routinely run when they respond to calls. It is not even clear that O'Flaherty should have considered the risk that Plaintiff would run at all. Even if he did, he was not required to consider the risk that Murphy would be (1) running in a zig-zag path, or (2) injured while running. Finally, even assuming he did consider that unlikely outcome, he was entitled, as a matter of law, to disregard the risk that it would occur,

for the simple reason that the costs associated with not calling—a possible mauling of the angry patron by the police dog—were far worse.

A request for help from a police officer almost always entails some small risk that a responding officer will be injured. (Needless to say, the analysis would differ significantly if the 10–85 call were made as a prank, but that is not the case). However, at least in this case, that risk is far outweighed by the benefits associated with officers freely asking for assistance and exercising greater, rather than less, caution.

Murphy has failed to meet his burden of production on the element of MTA's negligence, on either of his theories. Thus, the MTA's motion for summary judgment on Murphy's knee injury claims is granted.

### ii. The emotional injury

Plaintiff makes additional claims for emotional suffering arising out of (1) the series of gun-pointing incidents involving his former supervisor, Sergeant Camean, and (2) the MTA's insistence that he return to work in Penn Station after Camean's removal from his post.

### 1. Based on the gun threats

■ The conduct complained of sounds in the intentional torts of assault, battery, and intentional infliction of emotional distress. When a fellow employee's intentional tort is the alleged basis of an employer's FELA liability, there are two theories on which a Plaintiff may make his case. The first is the common law doctrine of respondeat superior, which holds that the master will be held responsible for the torts of his servant, if they are committed in the course of the employment. The second is a direct theory, namely that the employer was negligent for failure to supervise the offending fellow employee. *Higgins v. Metro–North R.R. Co.,* 318 F.3d 422, 425–28 (2d Cir. 2003) (applying *Lancaster v. Norfolk and W. Ry. Co.,* 773 F.2d 807 (7th Cir.1985)).

### a. Via respondeat superior

■ Under FELA, liability for the intentional torts of an employee whose tortious acts are committed within the scope of employment may be imputed to the employer under the doctrine of respondeat superior, but "no liability attaches when an employee acts 'entirely upon his own impulse, for his own amusement, and for no purpose of or benefit to the defendant employer.'" *Gallose v. Long Island R.R. Co.,* 878 F.2d 80, 83 (2d Cir.1989) (quoting *Copeland v. St. Louis–San Francisco Ry. Co.,* 291 F.2d 119, 120 (10th Cir.1961)).

■ Normally, whether an employee is acting within the scope of employment is a question "to be resolved by the jury from all the surrounding circumstances." *Goldwater v. Metro–North Commuter R.R.,* 101 F.3d 296, 298 (2d Cir.1996) (quoting *Gallose,* 878 F.2d at 84). This is especially true in actions brought under the FELA, where "the role of the jury is significantly greater ... than in common law negligence actions," and where the jury's right to pass upon the question of the employer's liability "must be most liberally viewed." *Johannessen v. Gulf Trading & Transp. Co.,* 633 F.2d 653, 656 (2d Cir.1980); *Eggert v. Norfolk & W. Ry. Co.,* 538 F.2d 509, 511 (2d Cir. 1976). Consequently, the scope of employment issue may be taken from the jury only when it is clear that "reasonable men could not reach differing conclusions." *Baker v. Texas & Pac. Ry. Co.,* 359 U.S. 227, 228, 79 S.Ct. 664, 3 L.Ed.2d 756 (1959); *see also Wilson v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co.,* 841 F.2d 1347, 1354–55 (7th Cir.1988).

■ No reasonable mind could conclude that Camean was acting within the scope of his employment on any of the occasions when he pointed his gun at Murphy. Plaintiff does not suggest any plausible reason by which Camean's sadistic acts benefited MTA or furthered its business objectives. *Kelly v. Metro–North Commuter R.R.*, 37 F.Supp.2d 233, 239 (S.D.N.Y.1999) ("The key inquiry regarding the [respondeat superior] is whether it appears the alleged tortfeasor was attempting to act in furtherance of the employer's business or, instead, was motivated solely by personal interests, such as a delight in cruelty, with no potential benefit to the employer.") (citing *Gallose*, 878 F.2d at 83).

To establish a business-furthering objective on Camean's part, Plaintiff argues that Camean had a responsibility to manage and control officers of Murphy's level, and that the gun menacing was Camean's perverse effort to carry out that responsibility. Plaintiff also suggests that the assaults were carried out in an attempt to scare Murphy off of his post so that Officer Koenig could take the position. Plaintiff argues that this course of conduct was carried out pursuant to Camean's responsibility to "allocat[e] work assignments." Pl.'s Opp. at 17.

Neither of these conclusions comports reasonably with the undisputed facts. First of all, the March 19 gun pointing incident involved Camean sneaking up behind Murphy and—unbeknownst to him— aiming the gun at his head. No reasonable juror construe this deliberate attempt *not* to alert Murphy to his presence as an effort to "control" or "order" Murphy's conduct of his duties. Likewise, this surreptitious behavior does not jibe with Murphy's other theory, namely that the gunplay was designed to scare Murphy off his post. Rather, at least as to the March 19 incident, it appears that Camean was sadistically amusing himself (and possibly others).

As to the other threats, Plaintiff supposes that Camean was attempting to secure the First Avenue position for Koenig, but he offers not a scintilla of evidence tending to prove that his supposition is based in fact. Moreover, Plaintiff argues that Camean's motive for moving him out and Koenig in was to help Koenig maintain a low profile during the investigation of the Cherry beating. *Id.* at 16. Placing a suspect in a less visible post in order to hinder the MTA's internal investigation does not further any business interest of the MTA. Thus, Plaintiff's "allocation of work" theory is not supported by the facts.

Instead, the evidence compels the conclusion that Camean carried out these threats either to keep Koenig out of sight—as Plaintiff himself suggests—or for his own sadistic pleasure. For instance, Murphy testified that Camean laughed or grinned maniacally during the course of these threats, and there is no evidence to the contrary. This paints the picture, not of an over-zealous disciplinarian at bottom trying to keep order on the job, or of a misguided manager going about work assignation in utterly the wrong way, but of a malevolent prankster with a personal grudge against the Plaintiff, While this makes Camean's actions all the more reprehensible, it also undermines Plaintiff's argument that the MTA should answer for them.

Thus, even under the liberal FELA threshold for jury issues, I rule as a matter of law that these intentional torts cannot be imputed to MTA on the basis of respondeat superior.

### b. Negligent supervision

■ The MTA may be liable to Murphy for his emotional injuries if it

negligently hired, supervised, or failed to fire Camean. In order to demonstrate negligent supervision, Murphy must show that MTA "knew or should have known prior to the [incidents] of propensities of [defendant] to commit such [acts]." *Higgins,* 318 F.3d at 426 (quoting *Harrison v. Mo. Pac. R.R. Co.,* 372 U.S. 248, 249, 83 S.Ct. 690, 9 L.Ed.2d 711 (1963) (per curiam)). Plaintiff's burden is thus two-fold: he must show both that (1) Camean had a propensity for "the type of behavior that caused plaintiff's harm," and (2) the MTA knew of this propensity. *Wahlstrom v. Metro–North Commuter R.R. Co.,* 89 F.Supp.2d 506, 515 (S.D.N.Y.2000) (citing *Ross v. Mitsui Fudosan, Inc.,* 2 F.Supp.2d 522, 532 (S.D.N.Y.1998)). As with the other FELA causes of action at issue in this case, a relaxed standard for surviving summary judgment applies to this analysis. *Id.*

This particular theory of liability should be presented to a jury. Therefore, Defendant's motion for summary judgment must be denied.

### *Admissibility of Plaintiff's evidence*

Plaintiff relies on a number of civilian complaints and internal affairs records to support his claim that Camean had violent tendencies, and that the MTA knew or should have known of those tendencies before Plaintiff was injured. Defendant argues that this evidence cannot be considered, because it is hearsay, violates the best evidence rule, and is more prejudicial than probative. *See* Def.'s Resp. at 5–11.

 "It is appropriate for a district court ruling on summary judgment to consider only admissible evidence." *Nora Beverages, Inc. v. Perrier Group of America, Inc.,* 269 F.3d 114, 123 (2d Cir.2001). However, a plaintiff need not introduce evidence in a form that would be admissible at trial in order to survive a motion for summary judgment. *See Celotex v. Ca-*

*trett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment."). Rather, Murphy must show the existence of facts, which may be proved by competent evidence at trial that would allow a reasonable jury to return a verdict in his favor. *See, e.g., Watts v. City of Hartford,* 2004 WL 717132, at *4 (D.Conn. Mar. 31, 2004).

 Defendant's "best evidence" argument rule is without merit, as Defendant possesses and vouches for the originals of the documents that Plaintiff received from Defendant during discovery. Defendant's argument that these documents are more prejudicial than probative is likewise without merit. Defendant has not specified any sense in which these documents are prejudicial to the MTA. These materials are not unrelated to the case, and they are not being offered into evidence for the sole purpose of casting a bad light on a police officer or his department. All of the contested materials tend to prove that the MTA had received numerous reports about Camean's behavior and so was on notice that he was a possible problem.

Defendant's hearsay objection is closer to the mark, but it is ultimately unpersuasive.

The evidence submitted by Murphy on this point can be divided into roughly four categories. First, there is deposition testimony from Lieutenants Laskowitz, Pattison and Harmon. Pattison and Laskowitz offered first person, eyewitness accounts about the fact that Camean had wielded his gun inappropriately (Pattison) and that Camean was an angry person (Laskowitz). Lieutenant Harmon testified about the investigation into Camean, in which he played a part, and in so doing testified to

the fact that the MTA had received some indication (via civilian complaints and anonymous sources) that Camean's conduct warranted attention. The fact of the MTA's receipt of notice remains relevant, whether or not the complaints giving rise to notice are true.

■ Second, there are the internal affairs files reflecting the investigation into Camean regarding the complaints, the Cherry beating, and the gun incidents involving Camean and Plaintiff. It is well recognized in this Circuit that internal police investigations—when they are relevant—are presumed admissible in a civil case as public record exceptions to the hearsay rule. Fed.R.Evid. 803(8)(C). This rule "is based upon the assumption that public officers will perform their duties, that they lack motive to falsify, and that public inspection to which many such records are subject will disclose inaccuracies." *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 143 (2d Cir.2000) (internal citations and quotations omitted); *see also Williams v. McCarthy*, 2007 WL 3125314, at *5 (S.D.N.Y. Oct.25, 2007) (SAS) (collecting cases where internal police reports were admitted under 803(8)).

The internal affairs reports were generated during an intensive investigation of Camean concerning many of the same events involved in this suit. Thus, Defendant bears the burden of establishing the untrustworthiness of any of the submitted evidence. *See In re Congdon*, 365 B.R. 433, 440 (Bkrtcy.D.Vt.2007) (when factual findings contained in a public record are based on a factual investigation, 803(8)(C) presumption of trustworthiness applies; opponent must present indicia of untrustworthiness to exclude evidence). Defendant clearly has not met this burden, or even attempted to. Its "argument" is limited to the unsupported statement that the reports about Camean's behavior are hearsay. *See* Def.'s Resp. 5–11.

The civilian complaints are submitted to prove the relevant fact that the MTA was on notice that Camean was creating problems in the public eye and should be watched. The complaints tend to prove this fact without regard to whether the statements contained therein are true. Moreover, the facts alleged in many of those complaints were investigated by internal affairs, and the corresponding internal affairs files contain the MTA's conclusions about whether or not the complaints were true. Importantly, the internal affairs investigations into the complaints naming Camean specifically substantiated many of the claims, and concluded (1) that Camean mishandled the Tucker and Cherry incidents, and (2) that Camean had pointed his gun at Plaintiff on numerous occasions. Thus, if there is any problem with the form of the civilian complaint records, it is alleviated by the availability of the same evidence in a less objectionable form.

The only potentially inadmissible evidence are those statements reported in the public records that are themselves hearsay. Under Rule 805, hearsay within hearsay is only admissible if a recognized hearsay exception applies at both layers.

However, it is unnecessary to dwell too long on this issue at this stage, because all Plaintiff has adduced enough evidence to survive this summary judgment motion. Plaintiff appears able to identify and subpoena all of the relevant declarants reported in the public records. These individuals may be called at trial to testify. *See Celotex*, 477 U.S. at 324, 106 S.Ct. 2548 (denial of summary judgment must be based on facts that would be admissible in evidence, but plaintiff need not produce evidence of facts in a form that would be admissible at trial in order to avoid sum-

mary judgment); *see also Watts*, 2004 WL 717132, at \*4 n. 10 (considering hearsay evidence at summary judgment stage because "Plaintiff could presumably identify and subpoena police department personnel with personal knowledge of the matters discussed in the [hearsay].")

As will be seen, Plaintiff presents facts that he could prove through competent evidence that would support a verdict in his favor. Much of Plaintiff's evidence is admissible in its current form, and what is not at least indicates facts that may be proved through competence evidence in a different form at trial.

*Evidence of Camean's propensities and notice to the MTA*

To reiterate: in order to demonstrate negligent supervision, Murphy must show that MTA "knew or should have known prior to the [incidents] of propensities of [defendant] to commit such [acts]." *Higgins*, 318 F.3d at 426. Plaintiff's burden is thus two-fold: he must show both that (1) Camean had a propensity for "the type of behavior that caused plaintiff's harm," and (2) the MTA knew of this propensity. *Wahlstrom*, 89 F.Supp.2d at 515.

■ I conclude that Plaintiff has raised a jury issue with respect to Camean's violent and gun-wielding propensities. Besides his own substantiated allegations of being threatened by Camean, Plaintiff also presents the deposition testimony of Lieutenant Pattison, who saw Camean inappropriately wield his weapon (Pl.'s Ex. 90), as well as the anonymous tip that Camean had pointed his gun at another officer (Pl.'s Ex. 4). Plaintiff also presents the circumstantial evidence of a pattern or spike in police violence beginning shortly after Camean took on a supervisory role at Penn Station. Pl.'s Exs. 22–54. On the basis of this evidence, a reasonable jury could find that Camean had a propensity

to commit the kinds of act that are alleged as the basis of the MTA's liability here.

Plaintiff has also raised a jury issue about whether the MTA was on notice as to Camean's violent tendencies, and if so, when. Taking all of the evidence in the light most favorable to Murphy, a reasonable juror could impute to the MTA notice of Camean's propensities at a time prior to at least some of the gun threats. For instance, Plaintiff submits evidence of an incident involving Camean and a civilian named Tucker. Pl.'s Ex. 25 (Civilian complaint of Tucker); Pl.'s Ex. 49 (Internal Affairs Report concerning Tucker). After Tucker was allegedly beaten by four unidentified police officers in Penn Station, he attempted to report this fact to Camean, who allegedly told Tucker to "fuck off." Clearly dissatisfied with Camean's response, Tucker filed a civilian complaint.

Although Camean is not alleged to have been involved personally in the beating, the manner in which it was handled by the MTA is telling. The investigation and exoneration of Camean was carried out by a Lieutenant Laskowitz, Camean's immediate supervisor, rather than by internal affairs. *See* Pl.'s Ex. 49. After the Cherry beating and the revelation of the threats made toward Plaintiff, however, Camean's records were scrutinized more closely by internal affairs, and Laskowitz was disciplined for failing to investigate the Tucker complaint in an adequate manner. *Id.* Plaintiff points to this official finding of failed investigation to argue that, but for the negligence of the MTA, they would have known about the "reign of terror" being carried out by Camean and his Wolf Pack, and hence known of his propensities prior to Plaintiff's injuries.

Besides the complaints naming Camean personally, Plaintiff argues that notice should be imputed to the MTA on the basis of a pattern, or spike, of reported

police violence commencing immediately after Camean assumed a supervisory role. The most prominent of these violent incidents was, of course, the Cherry beating, in relation to which Camean was eventually indicted. *See* Pl.'s Ex. 50 (Internal Affairs Report concerning Cherry).

In addition to these reports, Plaintiff also submits the testimony of Lieutenant Pattison, who, as a superior of Camean's, witnessed him inappropriately un-holstering his weapon. Pl.'s Ex. 90. An Officer Stallone admits telling Plaintiff that he had seen Camean pull his gun inappropriately. Pl.'s Ex. 3. Likewise, Lieutenant Laskowitz, another of Camean's superiors—and the one eventually disciplined for inadequately investigating Camean—reported that he believed that Camean was an "angry person." Pl.'s Ex. 50, at Pltf: 002771.

Taken together, resolving all ambiguities and drawing all inferences in Plaintiff's favor, the evidence presented is sufficient to survive summary judgment on the question of when the MTA should have known of Camean's violent propensities. If Plaintiff's evidence is credited, MTA employees both above and below Camean's rank were aware of his behavior. Camean's supervisors, including internal affairs, were aware of the civilian reports. The Cherry incident, which occurred before any of the alleged threats made against Plaintiff, could be found to impute notice that something was wrong with Camean and the men under his control. On the basis of these facts, a jury could impute notice to the MTA at some point prior to Plaintiff's injury.

Of course, one might question whether notice could be imputed before all of the threats made against Murphy, and what the MTA reasonably would or could have done had it known of Camean's tendencies. However, it must be remembered that under FELA, the MTA may be liable for even very slight negligence, if it played any role in causing Murphy's injuries. *Ulfik v. Metro–North Commuter R.R.*, 77 F.3d 54, 58 (2d Cir.1996) ("The test is whether 'the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury ...' ") (quoting *Rogers v. Mo. Pac. R.R. Co.*, 352 U.S. 500, 506, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957)). Hence, a jury must be allowed to consider when the MTA should have known about Camean's propensities; what the MTA should have done once it knew; and whether, having done it, Murphy's injuries might have been avoided.

**2. Based on being asked to return to Penn Station**

Plaintiff's final claim is for damages arising from the MTA's insistence that he return to work at Penn Station despite the continuing presence of some members of Camean's Wolf Pack. I construe this cause of action to be one for negligent infliction of emotional distress, as there is no suggestion that the MTA intended to cause Murphy's suffering, or that the MTA's insistence was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Higgins v. Metro–North R. Co.*, 143 F.Supp.2d 353, 361 n. 2 (S.D.N.Y.2001), *aff'd*, 318 F.3d 422 (2d Cir.2003) (internal citations and quotations omitted). Also (as will be seen), Murphy's claim does not satisfy the "zone of danger" test. This may be an additional ground for rejecting an intentional infliction claim, as some courts have held that intentional infliction claims, like negligent infliction claims, are subject to the zone of danger requirement. *See, e.g., Gallimore-Wright v. Long Island R.R. Co.*, 354 F.Supp.2d 478 (S.D.N.Y.2005) (LAK).

Negligent infliction of emotional distress is a cognizable claim under FELA. *Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 114 S.Ct. 2396, 129 L.Ed.2d 427 (1994). However, the claim is subject to the common-law "zone of danger" requirement. *Crooks v. Metro–North Commuter R.R. Co.*, 1994 WL 719683 (S.D.N.Y. Dec.28, 1994). This means that a plaintiff seeking to recover for purely emotional damages caused by the negligence of another must show that he was within a certain proximity of some physical danger before he can recover.

> [A] worker within the zone of danger of physical impact will be able to recover for emotional injury caused by fear of physical injury to himself ... Railroad employees thus will be able to recover for injuries—physical and emotional—caused by the negligent conduct of their employers *that threatens them imminently with physical impact.*

*Gottshall*, 512 U.S. at 556, 114 S.Ct. 2396 (emphasis added).

It is clear that Murphy cannot meet this requirement. The mere suggestion that he return to a dangerous environment is insufficient, as a matter of law, to satisfy the zone of danger test. *Crooks*, 1994 WL 719683, at *2–3.

Murphy's claim is strikingly similar to the one made by the Plaintiff in *Crooks.* In that case, plaintiff was a Metro–North employee who was instructed to work alone at the North White Plains station. Plaintiff informed his supervisor that he believed the position was dangerous and did not want to work it alone. When the supervisor insisted, plaintiff became nauseated, and suffered a number of other physical and emotional ailments allegedly caused by the stress. Plaintiff filed suit against Metro–North under FELA, arguing that it was negligent for Metro–North to insist that he work the dangerous shift, and that this negligence caused his injuries.

The court dismissed plaintiff's claims on the pleadings, holding, "It is clear that it was the fear and anxiety produced by plaintiff's own reaction to defendant's directive to work alone, rather than any direct threat of imminent physical injury, which led to [plaintiff's injuries]." *Id.* at *2.

Here, Murphy alleges that, upon being instructed to return to Penn Station he became extremely upset and suffered emotional injury. However, what Murphy does not, and cannot, plead is that the *order to return itself* "threaten[ed] [Murphy] imminently with physical impact." *Gottshall*, 512 U.S. at 556, 114 S.Ct. 2396. Because the order to return is the only conduct complained of in the third cause of action, it must be dismissed.

Therefore, Defendant's motion for summary judgment is granted on Plaintiff's claim that ordering him to return to work at Penn Station amounted to negligent infliction of emotional distress.

## IV. Conclusion

For the foregoing reasons, summary judgment is granted to the MTA on all causes of action relating to Plaintiff's knee injury, or based on the MTA's insistence that Plaintiff return to work at Penn Station.

Defendant's motion for summary judgment is denied as to the cause of action for negligent supervision arising from the alleged gun threats made against Plaintiff by Sergeant Joe Camean.

The foregoing constitutes the decision and order of the court.